## McClintock *et al. versus* Dana *et ux.*

1. A testatrix by her will-devised her residuary estate to her executor in trust, to invest the personal estate and the proceeds of her real estate, and to apply so much of "the yearly proceeds or income" thereof as should be necessary for the support of her daughter during her minority, and to invest for accumulation whatever balance there might be of such income. Upon the majority of the daughter the entire income of the estate was to be paid to her during her life, and after her death the corpus of the estate was limited to her children. The executors had power both to lease and to sell real estate, and in pursuance thereof "leased" certain coal land, unopened when the testatrix died, to lessees who were empowered to mine the coal until it was exhausted, paying therefor a certain royalty or rent.

   *Held*, that the rent or royalty thus received was payable by the trustees to the daughter as *cestui que trust* for life, as "income" of the estate within the meaning of the will.

2. Eley's Appeal, 7 Out., 300, followed.

April 18, 1884.  Before MERCUR, C. J., GORDON, PAXSON, TRUNKEY, STERRETT, GREEN and CLARK, JJ.

ERROR to the Court of Common Pleas of *Luzerne county :* Of January Term, 1884, No. 381.

This was a case stated in the nature of a special verdict, in which Charles E. Dana and Emily Hollenback, his wife, to her use, were plaintiffs, and Andrew T. McClintock and Edward P. Darling, executors of the last will and testament of Sarah H. Woodbury, deceased, were defendants.

The case as stated was substantially as follows: Emily H. Dana, the plaintiff, was the only child of Sarah H. Woodbury, the defendants' testatrix, who died on March 24, 1871, leaving a last will dated June 14, 1869, duly admitted to probate. By her said will the testatrix devised her residuary estate to Andrew T. McClintock and Edward P. Darling, her executors in trust, to invest from time to time her personal estate and the proceeds of her real estate, either from annual profits or from the sales thereof, thereinafter authorized to be made, "in such securities as the said trustees, and to apply so much of the interest and yearly proceeds or income of my estate, real and personal, as, in the opinion of the said trustees, shall be proper and necessary for the suitable and comfortable support of my daughter, Ellen Hollenback Woodbury, until she attains the age of twenty-one years; the balance of the income of my residuary estate, if any, after a liberal allowance for the support of my said daughter, to be securely invested as aforesaid.

"And upon the further trust to pay over to my said daughter after she attains the age of twenty-one years, yearly, in each and every year for and during her natural life, the entire

yearly interest and net income of my said residuary estate, and the yearly interest and net income of any and all accumulations thereof, for her sole and separate use and benefit, and upon her sole and separate receipt, without the joinder of or interference in any way of her husband, if she should marry, as is now or may hereafter be contemplated."

After the death of her daughter, the testatrix directed her executors to convey the estate to her children on their attaining the age of twenty-one; and by another clause gave her executors full power to lease or sell her real estate. The testatrix's daughter married Charles E. Dana in November, 1870, and had by him two children. At the time of her death the testatrix was seised as a tenant in common of certain coal lands, then unopened in Luzerne county, and was interested in the rental of other coal lands then opened and leased to the Wilkesbarre Coal and Iron Company, and the Delaware and Hudson Canal Company. On July 1, 1882, the executors and trustees united with the other tenants in common with their testatrix in a lease to the Lehigh Valley Coal Company, by which the lessors did " demise, lease and to mine-let " to the lessees " all the coal in, under and upon " a certain tract of land, " together with the right to mine and remove said coal until all the coal in, under and upon said tract of land shall have been exhausted." A rent or royalty was reserved to the lessors proportioned to the number of tons removed, and the size of the coal, as set forth below in the opinion of the court. Under the said lease the defendants as executors and trustees of the said will had received as their share of the rentals up to and including October 1, 1883, the sum of $1,993.91. This sum the defendants refused to pay over to the plaintiffs, on the ground that it was not part of the income of the estate, but of the principal.

" If the court shall be of the opinion that the rents reserved under the said lease to the Lehigh Valley Coal Company, and so received as aforesaid by the said defendants, are payable to the said plaintiff, Emily Hollenback Dana, then judgment to be entered in favor of the said plaintiff, but without costs. If, in the opinion of the court the said moneys are not so payable, then judgment to be entered for the defendants, with costs," both parties reserving the right to a writ of error.

The court (RICE, P. J.), entered judgment in favor of the plaintiffs. The defendants thereupon took this writ, assigning for error the entry of this judgment.

*G. R. Bedford*, for plaintiffs in error.—As the lease gives the lessees the right to mine all the coal in the tract, it amounts to a sale out and out: Gowan *v.* Christie, L. R. 2 Scotch App.,

273; Sanderson *v.* Scranton, 9 Out., 469; Funk *v.* Haldeman, 3 P. F. S., 244; Scranton *v.* Phillips, 13 Norris, 22. A guardian cannot "lease" minerals in this way without the approval of the Orphans' Court, as it is in effect a grant of a part of the corpus of the estate: Stoughton's Appeal, 7 Norris, 198; Eley's Appeal, 7 Out., 300, is distinguishable on two grounds: (1) In that case the beneficiaries themselves were to join in the lease, and the exercise of the power was dependent on their action; and (2) there was no provision in the will there interpreted for disposing of the accumulation arising from the coal lease. As the coal is part of the land, its proceeds constitute capital, and cannot in any sense be considered as income.

*J. Vaughan Darling,* for the defendants in error.—"Income" means the gain which accrues from property, labor or business. In its popular meaning it is strictly applicable to the periodical payments in the nature of rent, which are usually made under coal leases: Eley's Appeal, 7 Out., 300. The testatrix distinguishes between "interest" and "income" which she defines in her will as "yearly proceeds;" and the trust for accumulation during her daughter's minority affords a sure indication of intention: Eley's Appeal, supra. It is settled law that the rents of an opened mine are income, and go to the tenant for life: Stoughton *v.* Leigh, 1 Taunton, 410; Neel *v.* Neel, 7 Harris, 323; Irwin *v.* Covode, 12 Harris, 162; Griffin *v.* Fellows, 32 P. F. S., 114; Westmoreland Coal Co.'s Appeal, 4 Norris, 344. Moreover, the authority to lease places the property in the same position as after testatrix had leased them in her life time: Daly *v.* Beckett, 24 Beav., 114. The reservation of the title is sufficient to make the sum to be paid rent, incident to the reversion. The strongest and most familiar illustration of this is the common ground-rent deed. There the entire subject of the grant passes to the vendee, subject to the payment of an annual rent, which is incident to the reversion. The sum to be paid, or the consideration, is still *rent.* Such a grant, indeed, cannot be made under a power to sell; because that is not what is meant by selling, and because the price received is real estate: Cobb *v.* Biddle, 2 Har., 444. The exhaustion of the mine is not the test, because that might as well take place in one year as in a thousand; but it has never been contended that a coal lease for one year was anything more than a lease. These instruments have always been recognized in the body of our statute laws as leases. By the Act of April 27, 1855, P. L., 369, Purd., 486, and the supplementary Act of April 3, 1868, P. L., 57, Purd., 486, and May 13, 1876, P. L., 160, Purd., 2004, leases of "mining lands"

were made subject to mortgages, executed and recorded in the manner therein provided, with the same effect as freehold estates, and such mortgages were made enforceable by the same remedies as mortgages upon freehold estates. But if such instruments were, in reality, grants of freehold estates, these enactments were worse than useless and foolish: Miners' Bank v. Heilner, 11 Wright, 452 ; Trout v. McDonald, 2 Norris, 144 ; Griffin v. Fellows, 32 P. F. S., 114 ; Effinger v. Lewis, 8 Casey, 367 ; Offerman v. Starr, 2 Barr., 394 ; Greenough's Appeal, 9 Barr., 18 ; Daly v. Beckett, 24 Beav., 114 ; Barrs v. Lea, 33 L. J. Ch., 437 ; Daly v. Beckett was recognized in Eley's Appeal, 7 Out., 300.

Mr. Justice CLARK delivered the opinion of the court, October 6, 1884.

The testatrix, Sarah H. Woodbury, at the time of the making of her will, and at her death, was the owner of one undivided fifth part of the coal, in and under a certain tract of land, in the township of Kington, County of Luzerne, containing one hundred and sixty-eight acres and forty perches; she had no interest in the surface ; that was held in fee by Emily L. Wright, one third ; Augusta McClintock, one third ; and the heirs and devisees of Ellen E. Rutter deceased, one third. There was, therefore, in the condition of the title, a severance of the surface from the underlying strata of coal; how that severance was effected we are not informed. The possession and ownership of the coal was and is distinct and independent of the surface.

By her last will and testament the testatrix, after providing for the payment of her debts, and certain legacies therein created, bequeathed and devised all the rest and residue of her estate, real, personal and mixed, to trustees, upon the trust :—

First—To invest the personal estate, and the proceeds of the real estate, in such securities as they may deem safe, and to apply so much of the interest and yearly income thereof as may be necessary to the support of her daughter, the appellee, until she should attain the age of twenty-one years, the balance of the income of the residuary estate to be securely invested as aforesaid.

Second—When her said daughter should attain the age of twenty-one years to pay over to her yearly, during her life, " the entire yearly interest and net income of her said residuary estate, and the yearly interest and net income of any and all accumulations thereof for her sole and separate use."

Third—After the death of her said daughter, to pay over

the entire personal estate, and convey the real estate that may remain, as by the will is further directed.

She gave to her trustees, and the survivor of them, full power and authority either to lease " for any term of years," or " to grant, bargain and sell " her real estate at such time, on such terms and for such prices, as they might deem most for the benefit of her estate.

On the first day of July, 1882, the trustees, pursuant to the powers conferred by the will, joined with their co-tenants in an instrument of writing, which is denominated a "lease," and "leased" to the Lehigh Valley Coal Company "all the coal," in or under the tract of land already referred to, "with the right to mine and remove said coal until all the coal in, under and upon said tract of land, shall have been exhausted," the lessees yielding and paying therefor twenty-five cents per ton of 2240 pounds, for all coal larger than pea coal, during the first ten years, and thirty cents thereafter; the royalty on pea coal to bear the same proportion to the royalty on other coal as the market price of the former bears to the latter, but in " computing the minimum tons of coal to be paid for annually, pea coal not to be considered;" the minimum rent or royalty for the first year to be $8,412.50, for the second year $12,618.75, and for each and every year thereafter $16,825. The lessees reserved the right of reimbursement, in coal larger than pea coal, for payments in excess of the quantity mined, and agreed to pay for all coal mined, over and above the minimum amount, at the price and rates per ton specified. Provision is made also for the ascertainment, from time to time, of the precise quantity of coal mined, and for the payment of the rent or royalty in quarter yearly installments, the lessors reserving the right to forfeit and annul the lease, in case of three months default in payment. The lessees agree to pay all the taxes, assessed or to be assessed, on the coal demised.

The question here directly involved, as in Eley's Appeal (7 Out., 300), is to be determined according to the intent of the testatrix; the daughter's rights are commensurate with that intention, which being established the technical character of the rental becomes unimportant.

The daughter was the main object of the testatrix's solicitude—she was an only child, and her marriage was then in contemplation; the whole scheme of the will is to provide abundantly for her, and to make her secure in the enjoyment of that provision. The coal in place was to her valueless; the powers given to the trustees were for her benefit, and extended her right of enjoyment beyond that of a mere life tenant. Her interest was but an equitable one, and for life;

the mines were unopened, but her right was not as tenant for life, by the act of the law, but by the will of the owner, and that will provided the means by which an income might be realized.

If the mine was opened and operated under the power to lease, it was, beyond doubt, the testatrix's intention that her daughter should receive the profit of it, no matter with what force or energy the operations might be conducted ; if it was sold outright, then she should have the yearly interest upon the proceeds. Her income, therefore, from this coal was to be computed either upon the basis of the operation of the mine, or upon the proceeds of an actual sale. By a sale, however, the testatrix doubtless intended a conveyance of the property for an ascertained sum, paid in hand or properly secured, in the form usually pursued in the sale of real property. She certainly never intended that her daughter should receive merely the interest upon installments representing the actual annual profit or yield of the mines ; if she was to participate upon mere profits or yield, she was entitled to these wholly ; if in the sole value of the coal, then she was entitled to the interest only. The authority to lease or sell the coal, which was vested by the will in the trustees, and was exercised by them, so far as the present inquiry is concerned, places the rights of the *cestui que trust* upon the same footing as if that power had been exercised by the testatrix in her lifetime. What was done under the authority of the will is to be considered as if done by the testatrix herself. If the instrument of writing, here styled a lease, had been executed by Sarah H. Woodbury in her lifetime, and the mines had been in operation under it at her death, her intention as expressed in her will could not be mistaken. The word " income" is defined as the gain which accrues from property, labor and business; in the language of the will it is more specifically defined, in this case, as " the yearly proceeds of the real estate." In its ordinary and popular meaning, or as defined by the contract, it would be clearly applicable to the periodical payments accruing upon the contract with the Lehigh Valley Coal Company.

Nor is there any provision, express or implied, in the will that the incomes are to be accumulated for those in remainder. The accumulations referred to in the will clearly consist of the balances of the income of the residuary estate remaining after the withdrawal of " so much" as was necessary for the support of the daughter during minority; the trust for accumulation is for the benefit of the first taker, and is expressly limited to the period of minority. *Expressio unius est exclusio alterius.* This case is, we think, in all points, similar to

Eley's Appeal, *supra*. We can discover no appreciable difference between that case and this, and the conclusions arrived at in one seem to bind us in determining the other.

The judgment is affirmed.

Chief Justice MERCUR dissented.