MERCER et ux. v. BUCHANAN et al.

(Circuit Court, W. D. Pennsylvania. September 24, 1904.)

No. 14.

**1. TRUST—CONSTRUCTION OF DEED—LAW GOVERNING.**

Where a deed conveying property in trust was acknowledged, delivered, and accepted by the trustees in New York, where the grantor then resided, and the property conveyed was stock in corporations organized in four different states, in the absence of any provision designating a place of performance, the instrument is governed and to be construed by the law of New York, without reference to the residence of the trustees or the subsequent place of residence of the grantor.

**2. SAME—RULES OF CONSTRUCTION—GIFT.**

A deed conveying property in trust for the benefit of another by way of gift is to be construed solely with reference to the intent of the donor, unaffected by any presumption or equity in favor of the donee.

**3. SAME—INCOME FROM CORPORATE STOCK—RIGHTS OF LIFE TENANT AND REMAINDERMEN.**

Upon the question what constitutes income from corporate stock as between a life tenant entitled to the income under a deed of trust, and the trustees, who are required to preserve the capital for remaindermen, the courts are not bound by the name under which a distribution is made by the corporation to its stockholders, but must determine for themselves, from the facts and circumstances, whether the amount distributed is in substance income or capital.

**4. SAME—DIVIDEND FROM PROCEEDS OF SALE OF PROPERTY.**

The owner of stock in a corporation engaged chiefly in the manufacture of sheet steel, and owning a large plant devoted to that purpose, conveyed such stock to defendants in trust, to keep the property so conveyed invested, and to pay the net income to the grantor during her life, and afterward to complainant, her daughter, during her life, on her death the capital to be distributed to other designated beneficiaries. Before the grantor's death the company gave an option for the purchase of its steel plant and material on hand, and shortly after her death the sale was made in pursuance of such option, the company receiving a cash payment equal to 50 per cent. of its capital stock, and stock in the purchasing company equal in face value to six times its capital stock, all of which was distributed to its stockholders as a dividend, the company still retaining other subsidiary properties which it designed to operate. *Held*, that such dividend was not net income earned during complainant's life tenancy, to which she was entitled, but that the transaction was in substance a partial liquidation and distribution of capital by the company.

In Equity.

Weil & Thorp, for complainant.

Henry A. Miller, for respondents.

BUFFINGTON, District Judge. This is a bill in equity filed by Mrs. Helen B. Mercer, the second life tenant in a certain deed of trust dated January 16, 1900, against the trustees named therein. Her mother, Mrs. Kate B. Bingham, now deceased, was the maker and first life tenant under said deed. Mrs. Bingham, when it was executed, resided in New York City. She was apprehensive that death might result from Bright's disease, from which she was supposed to be suffering. Her husband had lost his mind and was in a sanitarium. She had but one daughter, the complainant, who was married, and whose husband's

employment necessitated residence in Western Pennsylvania. In this state of health, with no male relative near her to depend on, being possessed of very considerable estate, and Mrs. Bingham, as stated in her deed of trust, "being inexperienced in business myself, and feeling the necessity of having some competent person to take charge of my estate and of my business," executed the deed of trust here in question "for the purpose of securing a safe and secure income." By it she conveyed, inter alia, all her stock in the Apollo Iron & Steel Company (which company will in this opinion be styled the "Apollo Company") to the respondents, "in trust nevertheless to invest and keep invested the same and pay to me the income thereof, * * * which said net income shall be so paid to me, if possible, quarterly, during the term of natural life, and from and after my decease to pay over the same net income quarterly, as near as may be, unto my said daughter, Mrs. Helen B. Mercer, for and during the term of her natural life," with remainder to the latter's children, and in default thereof to certain collaterals. Mrs. Bingham died April 7, 1900. The present suit concerns certain dividends declared upon stocks of the Apollo Company, which dividends Mrs. Mercer alleges are payable to her as life tenant. It is well at this point to note that the keynote of construction of this deed of trust is the intent of the donor. The deed was not only voluntary and made without money consideration, but it contained a power of revocation by the donor during life. It was not the result of negotiation between her and Mrs. Mercer. The rights of the complainant beneficiary depended wholly upon the will and intent of the donor. Consequently the law raises no presumption or equities in the donees not expressed in the instrument or implied by the language or conduct of the donor. In deeds of gift, as in wills, the intent of the donor or maker prevails. Spooner v. Phillips, 62 Conn. 66, 24 Atl. 524, 16 L. R. A. 461; Gibbons v. Mahon, 136 U. S. 549, 10 Sup. Ct. 1057, 34 L. Ed. 525.

Mrs. Bingham, the creator of the trust, its primary beneficiary and first life tenant, was, as we have seen, when the deed was executed, a citizen and resident of New York; the three trustees and Mrs. Mercer, the second life tenant, were citizens and residents of Pennsylvania; the stocks covered by the trusts were in corporations chartered by the states of New York, New Jersey, West Virginia, and Pennsylvania respectively; the deed was executed and acknowledged in New York state; it was delivered by Mrs. Bingham, accepted by the trustees, and the securities turned over to them in New York. Mrs. Bingham subsequently came to Pittsburg and stayed at a hotel in that city until her death. It is alleged that her coming to Pittsburg, in connection with certain alleged declarations of an intent to reside there, and the fact that the trustees, who were residents of Pennsylvania, would transact the operations of the trust in that state, made this a Pennsylvania trust. The status of the deed, however, was fixed in January preceding, when it was executed, and we fail to see how any subsequent change of residence by the donor, if established, would affect such status. Nor, to our mind, is the conclusion warranted that the duties of the trustees were to be performed in any particular state. It was their duty to represent stock in corporations chartered by and located in four differ-

ent states, to collect the dividends from these companies, and pay them to the beneficiary, who resided in New York. Under such conditions, and in view of the fact that the deed neither expressly or impliedly designated a place of performance, we think it is to be regarded as a New York state instrument, since it was there executed, acknowledged, delivered, and accepted, and that it is presumed to have been made with reference to the law of such state; Benners v. Clemens, 58 Pa. 24; Brooke v. Railroad Co., 108 Pa. 529, 1 Atl. 206, 56 Am. Rep. 235; Allshouse v. Ramsay, 6 Whart, 331, 37 Am. Dec. 417; Watson v. Brentner, 1 Pa. 381. Moreover, the mere fact that the trustees were citizens of Pennsylvania would not make it a Pennsylvania trust; Fowler's Appeal, 125 Pa. 392, 17 Atl. 431, 11 Am. St. Rep. 902. While the nature, validity, and construction of this contract should be determined in the light of New York law, there are strong arguments for asserting that the question of what, under the facts of this case, fall under the term "income"—which is, after all, the crucial question—is one of such general character that a federal tribunal would solve that question in the light of its own reasoning and decisions. As, however, the federal and New York decisions are not conflicting when applied to the facts of the present case, we are not required to determine which system is controlling.

Let us now turn to the facts. The Apollo Company was chartered June 21, 1886, by the state of Pennsylvania, with a capital stock of $300,000, for the purpose of the "manufacture of iron or steel or both, or of any other metal or article of commerce from metal, and the galvanizing of iron or steel, or both, or of any other metal." Its operations were highly successful, and its capital had been, prior to the creation of this trust, increased to $2,000,000. Its principal business had been the making of sheet steel, which it carried on at its plants at Vandergrift, which it owned, and at Apollo, which it leased. The plant at Vandergrift had been built on a large farm, on which a new town was laid out. In carrying out this work of development, certain subsidiary companies for exercising public utilities, disposing of land, furnishing fuel, etc., had been formed, the stocks of which were owned by the Apollo Company. The operations of the latter company were successful, and its stock made dividend-paying. On March 16, 1900, a short time after the creation of this trust, the company gave an option on its Vandergrift plant, and its lease of the Apollo plant, on its material in stock and in course of manufacture, its good will, trade-marks and formulas, and on all of the stock of the Apollo Gas Company, the subsidiary company that furnished the plants with fuel. This option resulted in a sale thereafter made to the American Sheet Steel Company, and in payment the Apollo Company received $6,000,-000 in the preferred stock of the American Sheet Steel Company, $6,000,000 in its common stock, and $1,119,000 in cash, being for material, etc., on hand and in course of manufacture. The Apollo Company stipulated not to engage in the sheet steel business for 15 years. On May 5, 1900, the directors declared a dividend of 1½ shares of preferred stock of the American Sheet Steel Company (that is, $3,000,-000 in all) and a cash dividend of 50 per cent. (that is, $1,000,000 in

all) to each share of the Apollo Company, which said cash dividend was declared by resolution, and was in fact "paid to the stockholders thereof out of the cash consideration received for the sale of contracts, supplies, materials, etc., etc., at said works." This sale was made in pursuance of a circular letter addressed to the stockholders by the directors, in which it was announced the company had sold "its mill and plants, its sheet business * * * the capital stock of the Apollo Gas Company and the contract made by this company with the said Apollo Gas Company for gas to the American Sheet Steel Company and has surrendered to said Sheet Steel Company the lease this company held of the works at Apollo." It was further stated:

"These sales and transactions are deemed fair and advantageous to this company and its stockholders. Thus, while the company has disposed of a large portion of its property and business, yet it has received a reasonable consideration for the same, and still has valuable assets and property remaining, including the stock of the Chilled Roll Foundry, Vandergrift Land & Improvement Company, and other subsidiary companies, with which a profitable business may be carried on. Every precaution which the experience and prudence of the officers of this company have suggested have been taken to secure a proper organization of the American Sheet Steel Company, in order to place it on a sound financial basis, and to insure to it a successful, prosperous and profitable business, and we confidently believe that the holdings of the stockholders of the Apollo Iron & Steel Company in the preferred stock of the American Sheet Steel Company will be more profitable to them than the retention of the property so sold by the Apollo Iron & Steel Company would or could have been."

The circular further stated:

"As these are unusual and extraordinary dividends, and as the transactions are of very great importance to all our stockholders, it has been deemed best to have these dividends declared on condition that all the stockholders express their assent thereto, and approval of the sales, transfers and surrender above mentioned, to the American Sheet Steel Company. * * * In conclusion, we deem it proper to assure you that it is by no means the intention to close out the business of The Apollo Iron & Steel Company, but it is the intention to continue the business, and while it cannot and will not prosecute the steel business, it can and will, with the remaining assets, enlarge, improve and continue the business of manufacturing rolls, receive and collect its revenue from its subsidiary companies and still be free to engage in any other manufacturing business within the powers of its charter, which may promise to be profitable. It is the ambition of the officers and directors of The Apollo Iron & Steel Company to make its dividends as large in the future as they were before the sales, etc., to the American Sheet Steel Company, and for the accomplishment of this end, we invite the hearty and harmonious co-operation and assistance of all the stockholders."

Under the terms of the sale the $6,000,000 of common stock remained in escrow for one year, the circular stating:

"As the common stock is to be held for one year as stated, it will continue an asset of The Apollo Iron & Steel Company and will be subject to such disposition in the future as may be deemed best for the interest of the company and its stockholders."

On April 15, 1901, the $6,000,000 of common stock of the American Sheet Steel Company having been released and exchanged for an equal amount of the common stock of the United States Steel Corporation, which had absorbed the American Sheet Steel Company, the steel

company stock was distributed to the shareholders of the Apollo Company pursuant to the following resolution:

"Resolved, that the 60,000 shares of the common stock of the United States Steel Corporation, par value, one hundred dollars each, received in part consideration of the sale of the company's sheet business and fifty acres of land at Vandergrift, Pa., and of the surrender of the lease of the works at Apollo, Pa., and the transfer of the capital stock of the Apollo Gas Company, and contracts with it for gas, be divided among the stockholders of this company and that a dividend of one and one-half shares of the said common stock of the United States Steel Corporation to and for each share of stock of this company, be and the same is hereby declared and made to the stockholders of this company, which said dividend of stock shall be transferred, delivered and paid when and as soon as all the stockholders of this company shall assent to and ratify the said dividend."

The circular calling for a meeting of the stockholders to ratify this dividend recites:

"As the dividend is of an unusual and extraordinary character, it has been deemed best to have it declared on condition that the stockholders express their assent to and approval of the same. * * * In conclusion we deem it proper to inform you that The Apollo Iron & Steel Company will still continue in active business as outlined by our circular to you dated May 19th, 1900."

Subsequently the Apollo Company sold its chilled foundry business. It continued to pay dividends until April 1, 1901, since which time it has paid none, nor done any iron or steel manufacturing, galvanizing, or sheet business. Under such facts and conditions are the proceeds of the sale made to the American Sheet Steel Company, which have been distributed in the shape of a 50 per cent. cash dividend, a 300 per cent. preferred stock dividend, and a 300 per cent. common dividend, to be regarded as constituting income? It will be noted, the burden of showing they were income rests on the complainant. Peirce v. Burroughs, 58 N. H. 302; Eisner's Estate, 175 Pa. 143, 34 Atl. 577; Law v. Alley (N. H.) 29 Atl. 636. There is no presumption that the increase has been by accumulations of income (In re Cutler [Sur.] 52 N. Y. Supp. 842), and the fact that these dividends were in fact what they were aptly termed by the directors—"unusual and extraordinary"— would suggest this was particularly a case where the rule should be applied.

In taking up this question we must not be misled by names. Three dividends are here involved, one of cash, raised by a sale of the material, etc., on hands used in operating the plant, and two in stock of another company, taken in payment of the plants and business. These latter dividends, while in stock, were not stock dividends. They are to be treated and regarded as cash dividends. As was said in Matter of Rogers, 22 App. Div. 432, 48 N. Y. Supp. 175 (also reported on appeal, 161 N. Y. 112, 55 N. E. 393):

"It is precisely the same as a dividend of cash, because the corporation might have sold the stock and divided the money among the stockholders."

It is also to be noted that, while there are earlier New York cases holding that the action of a company in declaring dividend will be accepted as proof that such dividend is income, yet it has been held later that the courts are not bound by such corporate action, but will for

themselves ascertain what the dividend was in fact and substance, and from what source it was raised. Thus, in the well-considered and late case of McLouth v. Hunt, 154 N. Y. 198, 48 N. E. 548, 39 L. R. A. 230, it was said:

"When questions arise under a will between the parties standing in such relation to each other, with respect to the right to accumulated earnings upon capital stock, the courts must determine the questions for themselves according to the nature and substance of the thing which the corporation has assumed to transfer from the one to the other, and they are not concluded by mere names or forms. For all corporate purposes the corporation may doubtless convert earnings into capital when such power is conferred by its charter, but when a question arises between life tenants and remaindermen concerning the ownership of the earnings thus converted the action of the corporation will not conclude the courts."

This case was commented upon and approved in the later case of Lowry v. Farmers', etc., Co., 172 N. Y. 141, 64 N. E. 796. It was there said:

"Aside from cases which are substantially parallel in their facts and therefore within the precedent under the authority of McLouth v. Hunt, supra, courts will determine for themselves, 'according to the nature and substance of the thing which the corporation has assumed to transfer,' whether a dividend, when declared, represents income or not."

The court further adds:

"Then the transaction through which the property of the corporation is being distributed in the extraordinary form of a stock dividend is to be looked into in order that its true nature may appear, and that a determination may be reached whether capital or an accumulation of profits on the capital, is being divided among the stockholders. While the corporate action may not be necessarily conclusive upon the courts with respect to the question, if it is based upon facts, and is not purely arbitrary, it will and should be controlling."

Now the things sold by the Apollo Company, and from which these dividends arise, were its manufacturing plants and the working material, fuel supply, and other things incident and necessary to the operation of such a plant. In other words, it was the going steel concern as a whole that was sold. In what relation do these items stand to this manufacturing corporation? In New York state they would be treated as capital, and not as profits of a company. In Matter of Rogers, 161 N. Y. 112, 55 N. E. 393, the Court of Appeals said:

"What, then, is capital, and what is profits? In a manufacturing business a plant is of first importance, and, as the business increases, an enlargement thereof, with the necessary tools, fixtures, and machinery, is one of the things to which the earnings of the company may properly be devoted. This must be deemed to be fairly within the contemplation of the testator in creating the trusts with the capital stock of this company. After the plant there arises the necessity for raw material and labor to manufacture it. This requires what is usually termed a 'working capital,' and it, of necessity, varies in amount, depending upon the magnitude of the business. It must, therefore, also have been within the contemplation of the testator that a reasonable amount would be retained by the directors for this purpose."

In substantially the same way the distinction between capital and income obtains in Pennsylvania. In Vinton's Appeal, 99 Pa. 440, 44 Am. Rep. 116, the gasworks of the company was retained, and a part

of the distributing pipes was sold, together with a release of an exclusive right to furnish gas. It was there said:

"It is thus manifest that the money in dispute comes, not from the annual earnings of the company, but from a sale of part of its property; part of that very corpus which the stock shares represent, and without which those shares have neither substance nor value. If, therefore, the life tenant is entitled to this money thus derived from the capital of this corporation, so in the end may she come to be entitled to the whole corpus of the trust. For the accomplishment of this result, it is only necessary that the St. Louis Gas Company should effect a sale of the balance of its property, and order a distribution of the money so raised among its shareholders. But, logically, the effect of such a doctrine is to defeat the whole object of the trust. Instead of securing for Mrs. Vinton a sure income for life, it gives her the principal to use at her pleasure, whilst the gift over to Frederick Vinton is wholly defeated."

We think the facts in the present case show the dividends were abnormal, or, as the circular stated, of "an unusual and extraordinary character." They were pro tanto a liquidation and distribution of the backbone and corpus of the Apollo Company. The plant sold had enabled it to fulfill its chartered objects. It had built up its sheet business and earned its dividends. Its other operations were subsidiary and in aid of the work of this plant. The value of the plant, in connection with the business, was such that it commanded the extraordinary price received for it. It would seem, therefore, that when the company sold it, it parted with that which made its stock an income earner, and the outcome has shown such to be the case. What was left of the company was, with the exception of the foundry, companies called into being as mere adjuncts to its plants and business. Would any stockholder who received these unusual and extraordinary dividends regard them as profit or income which he could spend and consider that his capital or principal still remained intact? Would he not treat them as capital and regard them as the income-producing corpus which must be by him reinvested to in turn-produce the dividends which the Apollo Company, by the sale of its plants, was to that extent depriving itself of the power of earning and declaring? Now, if instead of paying the proceeds of this sale to the trustees in cash, which cash prudence suggested to a shareholder should be treated by him as capital and reinvested, the dividends were paid in stock of another corporation, why should not such stock be regarded and held by the trustee shareholder as capital and the very corpus of his trust as well? Moreover, not only was what was sold the body and corpus of the Apollo Company's business, but it would also appear that the enhanced value obtained was an increment and increase in the plant and business which had grown with years, and which was not treated by the company as an increase or profit of any one year. And it would further seem that all of this increment had accrued and was in process of realization prior to the commencement in enjoyment of the life tenancy of Mrs. Mercer, for the option on which the sale was consummated was given prior to Mrs. Bingham's death, and the proof is the sale was agreed on when the option was given, the latter being only a method used to secure ratification by the stockholders. Such being the case, and no part of this increment having been earned during Mrs. Mercer's life tenancy, we think the case of Gibbons v. Mahon, 136 U. S. 557, 10 Sup. Ct. 1057, 34 L. Ed. 525, is strikingly in point. There the devise to the

life tenant was of "the dividends of said stock and the interest of said bonds as they accrue to be paid, * * * without percentage of commission or diminution of principal." At the time of the vesting of the life tenancy the capital of the gas company, the stock of which was in question, was $500,000. Subsequently it was increased to $1,000,000. The $500,000 increase was made by a stock dividend based on a construction account which had exceeded that sum when the testatrix died. Under these facts the dividend was held to be of capital and not income, the court saying:

"To hold the plaintiff to be entitled to the whole of the new shares issued to the defendant would be to allow the plaintiff the exclusive benefit of earnings, the greater part of which had accrued and had been invested by the company as capital before her interest began, and would be contrary to all the authorities."

It is true in that case profits had been earned and carried in a construction account, which latter was made the basis of a stock dividend. But in that regard the case in hand is not so strong as the facts in the case cited. As we have seen, the burden of showing the thing demanded is income, and as such payable to the life tenant, is upon the latter. It is not shown here when this increment or profit was made. Whenever it was earned or whenever it accrued, certain it is that it was before Mrs. Mercer's life tenancy began. Not having been earned during the tenancy, it cannot, when substance is considered, be deemed income. The accretion, spreading, as it did, over the whole operative life of the Apollo Company, was not the gain of any particular year, and therefore an earning due to the then holder of its stock, but was a part and parcel of that permanent lasting ownership which is termed "capital." As such, we think, it is to be regarded, as was the increment on the bonds of trust in Gray v. Darlington, 15 Wall. 65, 21 L. Ed. 45, when, referring to a tax to be "levied, collected and paid upon the gains, profits, and income," the court said:

"The question presented is whether the advance in the value of the bonds, during this period of four years, over their cost realized by their sale, was subject to taxation as gains, profits, or income of the plaintiff for the year in which the bonds were sold. The answer which should be given to this question does not, in our judgment, admit of any doubt. The advance in the value of property during a series of years can in no just sense be considered the gains, profits, or income of any one particular year of the series, although the entire amount of the advance be at any one time turned into money by a sale of the property."

So here we cannot regard the proceeds of the sale of this plant as income. It was the bone, sinew, and corpus of the company. It is reasonable to suppose that the owner of stocks in a manufacturing company holds them on the theory and basis that the company will operate; that if it operated it will produce income, but that if it sold its plants, the proceeds would not be income, but capital, which could be reinvested, and from such investment income result. We think such reasoning is in accord with McClintock v. Dana, 106 Pa. 391, where, construing, as between life tenant and remainderman, a settlement involving coal royalties, the court said:

"If the mine was opened and operated under the power to lease, it was, beyond doubt, the testatrix's intention that her daughter should receive the

profit of it, no matter with what force or energy the operation might be conducted; if it was sold outright, then she should have the yearly interest upon the proceeds. Her income, therefore, from this coal was to be computed either upon the basis of the operation of the mine, or upon the proceeds of an actual sale. By a sale, however, the testatrix doubtless intended a conveyance of the property for an ascertained sum, paid in hand or properly secured, in the form usually pursued in the sale of real property. She certainly never intended that her daughter should receive merely the interest upon installments representing the actual annual profit or yield of the mines; if she was to participate upon mere profits or yield, she was entitled to these wholly; if in the sole value of the coal, then she was entitled to the interest only."

Indeed, it is clear to us that this sale of its plant by the Apollo Company, and agreement to refrain from carrying on for a long term of years the business in which it has made dividends, was, in substance and effect, pro tanto a liquidation and distribution. That it would be so regarded generally is shown by the fact that, when its advisability was to be considered by the stockholders, the directors felt called upon to notify them that the company would not cease doing business, and that in spite of the sale it expected to declare dividends from the operations of its foundry and the business of these subsidiary companies. The outcome, however, shows that the company eventually ceased manufacturing entirely; that it sold its foundry, and ceased paying dividends. Equity, therefore, looking beyond mere forms and names, and regarding substance only, sees in this sale a practical liquidation and distribution of the company's capital to the extent of the dividends here in question. If they are distributed as income and the trust shorn of their ownership the latter is, in that regard, left with a nondividend, nonincome-producing Apollo Company stock, and the object of Mrs. Bingham in hereafter securing from the trust "a safe and secured income" to her daughter is defeated. To say that she is better and more amply provided for in awarding her the stock absolutely, is not to carry out the will of the donor as embodied in the trust. And in so treating these stocks and retaining these "unusual and extraordinary dividends," in order to fill the provisions of the trust, the court is enforcing the object and purpose Mrs. Bingham had in view. Is it to be supposed, if these dividends had been declared during Mrs. Bingham's life tenancy, that they would have been regarded as income, and the burden of the management of stocks and cash $6\frac{1}{2}$ times in amount of the Apollo Company she had lately confided to the trustees, be resumed by her whose avowed reason for creating the trusteeship was her "being inexperienced in business myself and feeling the necessity of having some competent persons take charge of my estate and of my business."

After careful consideration of the facts, we are of opinion that the complainant has not met the burden resting upon her of showing that these dividends were income and as such she is entitled to take them out of the trust. The question of costs we will dispose of when a decree is submitted.