EUGENE DUPONT and EQUITABLE TRUST COMPANY, a corporation existing under the laws of the State of Delaware, Trustees under the Will of Eugene duPont, Deceased,

*vs.*

ANNE DUPONT, AMY E. DUPONT, JULIA DUPONT ANDREWS, BERNARD PEYTON, LUCY ANDREWS, JULIA ANDREWS, AIMEE ANDREWS, JAMES N. ANDREWS, JR., and ANNE RIDGLEY ANDREWS.

*New Castle, Jan.* 14, 1927.

*J. Rankin Davis*, for complainants.

*John P. Nields*, and with him *C. B. Garnett*, of Washington, D. C., for Julia du Pont Andrews and Lucy Andrews.

*Charles F. Curley*, for Anne du Pont Peyton, Bernard Peyton and Joseph C. Jolls, guardian *ad litem* for Julia Andrews, Aimee Andrews, James N. Andrews, Jr., and Anne Ridgely Andrews.

*John P. Nields*, for Amy du Pont.

THE CHANCELLOR. There are four dividends with which we are concerned in this case. They are:

(1) The 200 per cent. dividend paid on October 1, 1915, in common stock of the du Pont Company (1915) of Delaware to the common stockholders of the du Pont Company (1903) of New Jersey. This dividend amounts to 7,746 shares of the Delaware company.

(2) The 50 per cent. dividend of 3,873 shares of its own common stock paid to the Delaware du Pont Company's common stockholders on December 29, 1922.

(3) The 40 per cent. dividend of 4,647.6 shares of its own common stock paid to the Delaware du Pont Company's common stockholders on August 10, 1925. And

(4) The 100 per cent, dividend of 939 shares of its own common stock paid by the Hercules Powder Company to its common stockholders on November 15, 1922.

Do the dividends become a part of the corpus of the trust, or do they constitute income which goes to the life beneficiaries? This is the question which the bill presents.

Courts both in England and America have been called upon in a great many cases to consider the correct principle to apply in controversies between life tenants and remaindermen over what constitutes income and what does not. It is impossible to reconcile the various rules laid down in various jurisdictions. They appear to be in hopeless conflict in certain very material respects. There is no occasion for me to review and discuss the numerous cases that may be found in the books with the view of deciding what should be the general determining principles for guidance in this State. Our Supreme Court in the case of *Bryan, et al., v. Aikin, et al.*, 10 *Del. Ch.* 446, 86 *A.* 674, 46 *L. R. A.* (*N. S.*) 477, has done

this in a learned and discriminating opinion written by the present Chief Justice. The general principles which underlie consideration of such questions as the pending bill presents are to be found in that opinion. Before addressing myself to an examination of the question which the particular facts of the instant case present, it is appropriate to notice the language used in *Bryan, et al., v. Aikin, et al.*, as expressive of the general principles which must be regarded in answering the sort of question we are here concerned with. While some of the language thus employed might be said not to have been necessary for a decision of the particular case which was before the court, yet it is not to be dismissed as obiter for two reasons. The first reason is that in so far as it discloses the logic which induced the court to lay down the rule for this jurisdiction which it did, such language is entitled to acceptance as controlling in later cases where the deciding tribunal is seeking the correct *ratio decidendi* for its own conclusions. And in the second place, the court in the case of *Bryan, et al., v. Aikin, et al.*, seems to have designedly intended to lay down general principles which hereafter are to be regarded as settled in Delaware, regardless of whether the facts of the particular case then before it required either an acceptance or rejection of those principles; for the court said that, if possible, the rule adopted by it should be such as not only to govern the case before it, but should be such as would "also furnish a guide for trustees in the execution of other trusts of like character."

I feel bound, therefore, to accept as final not only the rule which the precise facts of *Bryan v. Aikin* necessitated, but also the rule in its broad scope which that case announced as well as the fundamental principles of reason which underlay the court's general conclusions.

There were two propositions which the court referred to in *Bryan v. Aikin* as not likely to be disputed. These were:

"(1) That the intention of the testator must be carried out so far as can be under the law. (2) That it was the intention of the testator in the present case that the capital or principal of the property left in trust should be kept unimpaired for the remaindermen, and that all dividends declared thereon out of the profits or net earnings should go to the life tenant."

These primary propositions are applicable to the instant case. While the will of Eugene du Pont did not in terms give dividends to the life tenants, yet it did give net income to them. And there can be no doubt, as indeed none has been suggested, that the word "income" embraces dividends when applied to corporate stocks. The will therefore must be regarded as giving dividends to the life tenants.

But these dividends, before it is certain that they are the property of the life tenants, must, as indicated in the second general proposition above quoted, be out of the profits or net earnings of the corporation.

Whether in a given case a specified dividend is attributable to profits or net earnings as its source is oftentimes a perplexing question. The various rules adopted by the courts in answering this question seem not to conflict with each other upon the proposition that the dividend must come out of profits or net earnings. Their conflict, and it is pronounced, arises rather out of the question of what weight the law will allow to given facts as decisive of the question whether the dividend is to be attributed to capital or to earnings. The Chief Justice in his review of the authorities in *Bryan v. Aikin* clearly shows such to be the case.

The result in Delaware, since *Bryan v. Aikin*, is that the so-called "American rule" is accepted as the law here without the apportionment feature based on the date of the inception of the life estate which prevails in those states where the so-called Pennsylvania rule has been followed. The "American rule" is the rule in Delaware and, quoting from *Bryan v. Aikin* is as follows:

"All net earnings, howsoever they may have been treated or used by the corporation during their accumulation, and regardless of the period during which they have accumulated, if declared as dividends out of net profits during the life tenancy, are given to the life tenant, whether such dividends are made in cash or capital, provided that the principal of the trust is not diminished thereby."

Seeking as it does to arrive at an adjustment of the respective rights of life tenants and remaindermen in accordance with equitable principles, the rule ought in many cases at least to contain the apportionment feature of the Pennsylvania decisions which hold that an allotment should be made to the corpus of that portion

of the dividend, whether in cash or capital stock, which represents earnings accumulated before the inception of the life estate, and to income that portion of the dividend which represents earnings since the inception of the life estate. The only reason why the Pennslyvania apportionment feature has not been accepted generally is because of practical difficulties in its application. These difficulties are so insuperable that some courts, including our own Supreme Court, have deemed it best to reject the Pennsylvania rule.

But it is to be observed that those courts which have rejected the Pennsylvania rule that apportions earnings with respect to the inception of the life estate because of its practical difficulties, have in no wise receded from the principle that dividends to which the life tenant is entitled must in fact have their source in earnings.

The view that the life tenants' rights to dividends must depend on the nature of their source, that is upon their origin in earnings, is emphasized throughout the opinion in *Bryan v. Aikin.* I think it well to quote expressions from that opinion in support of the statement just made, because, as I view the instant case, the disposition of the 200 per cent. stock dividend turns very largely upon the force of this view. The following excerpts from the opinion referred to bear on this aspect of the matter.

"Was the 'stock dividend' declared out of the net earnings? Were there, at the time the dividend was declared, net earnings that could be distributed?" (That was the question to which the court addressed its attention.) * * *

"The judicial purpose now is to ascertain the character of the transaction which formed the basis of the dividend declared. Indeed, it may be said that in all states where the question has arisen, the question, whether a dividend, in stock or in cash, shall go to the life tenant or remainderman, depends very much upon the real purpose and character of the corporate act. For example, while it is true that in almost every case a cash dividend, whether usual or extraordinary, belongs to the life tenant, yet if it appears that the cash so distributed was derived from a sale of a portion of the real estate of the corporation as it existed prior to the trust, it will go the the remainderman, because it was not paid out of profits, but out of the corpus of the property. * * *

"When the necessity for the reservation [of earnings for corporate purposes] ceases, and the reserve fund is divided among the shareholders, the question whether it was income or capital depends upon its origin, for their source is not changed by the delay in distribution. If it was originally taken from the net earnings it belongs to the tenant for life if distributed in his life-

time. In such case the accumulated income, as well as the securities and real estate purchased, all are assets of the corporation, but the earnings are not regarded as capital although they may have been treated by the corporation as such prior to the distribution. * * *

"In both Massachusetts and Pennsylvania, indeed, under all the modern decisions, the court may and should examine the nature of the corporate transaction, as well as the character of the dividend declared in order to determine whether the dividend is in fact a distribution of net earnings or an apportionment of new capital. * * *

"It is much more reasonable to suppose that he [testator] contemplated that all dividends, no matter what they are called, which represented the capital of the corporation would go to the remainderman, and all dividends, by whatever name, which represented net earnings, would go to the beneficiary for life. We believe this to be the law in this country according to the great preponderance of authority."

Before, therefore, the allotment of the dividend to either the life tenant or to the remainderman can be determined upon, the origin of the fund from which it is drawn must first be ascertained, that is to say, whether it finds its source in earnings or in capital. In the process of locating the source, no conclusive significance is allowed in this State as there is in Massachusetts and the few states that follow the rule of that jurisdiction, to the fact that the dividend is in stock or in cash. The question with which the courts of this State are concerned disregards the form of the dividend and looks only to its real nature and character as the same is indicated by the dividend's derivation from earnings on the one hand or from capital on the other.

The general principle which thus makes the character of the distribution turn upon the nature of its source is applied not only in cases involving typical stock dividends, which was the case of *Bryan v. Aikin*, but as well in cases involving other forms of distribution. Thus in *Matter of Rogers*, 22 App. Div. 428, 48 N. Y. S. 175, it was held that when a corporation is liquidated, its assets sold and the proceeds distributed among its stockholders, an apportionment must be made between the capital of the trust fund and the income, and so much of the sum received by the trustees as represents profits accumulated since the creation of the trust must be attributed to income and paid to the life tenant. (Of course under the rule of *Bryan v. Aikin*, the amount of income pay-

able to the life tenant would not in this State be dependent upon the time of creation of the life estate, for all income whenever accumulated is regarded when distributed as belonging to the life tenant.) In *Matter of U. S. Trust Co.*, 190 *App. Div.* 494, 180 *N. Y. S.* 12, affirmed in 229 *N. Y.* 598, 129 *N. E.* 923, the sum received by trustees for shares of stock in the Lake Shore & Michigan Southern Railway Company which was consolidated with another corporation, the trustees instead of taking stock in the consolidated company receiving the cash value of the shares as found in statutory condemnation proceedings, was apportioned between the life tenants and remaindermen according as the accumulated earnings of the Lake Shore Company were represented in the sum received. The case was held to be analogous to the distribution of assets of a corporation upon dissolution where the rule applies of alloting to income its proper share of accumulated earnings and what remains to principal. In the earlier case of *In re Schaefer*, 178 *App. Div.* 117, 165 *N. Y. S.* 19, affirmed in 222 *N. Y.* 533, 118 *N. E.* 1076, the facts were said to have shown in substance a liquidation to the extent of one-half of the corporate assets and a like apportionment between principal and income was decreed. In that case the holders of one-half of the corporation's stock sold their shares to owners of the other half who thereafter continued in control of the corporation as an active concern. The price received by the trustees for the stock sold by them was treated as though it had been paid in liquidation of one-half of the corporate assets and divided accordingly. The rule of the case of *In re Schaefer* was reannounced with approval in the later New York case of *U.S. Trust Co. v. Heye*, 224 *N. Y.* 242, 120 *N. E.* 645. That rule was repeated as follows:

"Where the trust fund consists of corporate stock the life tenant will ordinarily be limited to receiving only so much of the profits as the corporation sees fit to distribute in dividends, but when the accumulated profits come into the hands of the trustees *in any way or manner*, the life tenant is entitled to receive them."

In applying the New York rule the Court of Appeals in the last cited case allotted a portion of the dividends to corpus and a portion to income in accordance with what it conceived the evidence to show as to the nature and character of their source.

The case of *In re McKeown's Estate*, 263 *Pa.* 78, 106 *A.* 189, illustrates, as do the New York cases just referred to, how courts which reject the rigidity of the Massachusetts rule, and seek to arrive at what they regard as the equitable adjustment of the relative rights of life tenants and remaindermen, will disregard the form of the transaction in order to allow to income the enjoyment of earnings and at the same time preserve to the principal all of its values. In that case a trustee held shares of stock of the Pure Oil Company. All the stockholders of that company sold their stock for cash to the Ohio Cities Gas Company which acquired the entire assets of the Pure Oil Company. It was held that so much of the proceeds as represented the actual earnings of the Pure Oil Company went to the life tenants and all the rest, including profit on the sale, belonged to principal. The court said that it was true that a stockholder gets nothing from the corporation until a dividend is declared, but, observed the court, that is a matter between the corporation and the stockholders and does not necessarily determine the rights of a life tenant and remaindermen in an estate owning such stock. The opinion proceeds:

"If the company declares a dividend, whether of stock or cash, partially out of earnings and partially out of principal, a court of equity, made cognizant of the fact, will apportion the dividend between the life tenant and remainderman, in such a way as to maintain intact the principal of the estate, only giving the balance to the life tenant. So also, if a corporation sells its capital and accumulated income for a gross sum, a court of equity should distribute that sum according to like equitable principles."

In the *Estate of Gerlach*, 177 *Wis.* 251, 188 *N. W.* 94, the court quoted with approval the following from a note in 12 *L. R. A.* (*N. S.*) 805:

"Logically, it would seem that the respective rights of life tenant and remainderman in extraordinary distributions should be governed by the same principles, whether the distribution is made by a corporation which contemplates a continuance of its corporate existence and business, or is made in process of liquidation, or in contemplation of consolidation or merger with another corporation."

In applying this rule, the Supreme Court of Wisconsin in the cited case held that:

"Whatever moneys come into the hands of trustees as the proceeds of the liquidation of the brewing company, which can be said to represent profits of the business of the company earned during the term of the life tenant, shall be paid over by the trustees to the life tenant."

See also in line, as I conceive it, with the foregoing authorities, the *per curiam* opinion in *Mercer, et ux., v. Buchanan, et al., (C. C. A.)* 137 *F.* 1019, reversing *(C. C.)* 132 *F.* 501; *Lord v. Brooks*, 52 *N. H.* 72; and *Rhode Island Hospital Trust Co. v. Peckham*, 42 *R. I.* 365, 107 *A.* 209.

It appears, therefore, that where the *ratio decidendi* of the cases bearing on the sort of question we are now considering rests on the principle that the destination of the distribution is determined by the nature of its source, the same result is reached regardless of the form in which the transaction is cast—whether it be in the form of a typical stock dividend as in *Bryan v. Aikin*, or in the form of a distribution in liquidation, or in some way analogous thereto. Those cases which may appear to hold otherwise will be found to have arisen in jurisdictions where the Massachusetts rule, which is a rule of convenience and adheres to the form rather than to the substance of the transaction, is accepted as the law. The jurisdiction of Delaware, however, is not among them.

In view of the foregoing, it is necessary, in order to determine whether the dividends here in controversy possess the character of either income belonging to the life tenants or of capital belonging to the corpus, to ascertain from the facts whether their source is shown to be in earnings or in capital. There are four such dividends. The first, or 200 per cent., dividend is the most important one, as well as the one that causes the most controversy.

I now turn to a consideration of the facts which relate to that dividend in order to discover its source or origin. These facts will not be recited herein. They appear with sufficient fullness in the statement preceding the opinion. I shall discuss only their significance. The dividend was made possible by a transaction which in point of form was one of a sale between the New Jersey company as vendor and the Delaware company as vendee. The New Jersey company exchanged all its assets of every nature subject to all its liabilities (except capital stock and funded liabilities) for debenture and common stock of the Delaware company. It sold its en-

tire business as a going concern. Out of the consideration received therefor it declared a dividend of 200 per cent. payable not in cash but in specific assets, viz. shares of common stock of the vendee company, leaving in its treasury sufficient debenture stock of the vendee company to pay yet another 100 per cent. dividend on its common stock. The 200 per cent. dividend, though paid in common stock, was not a typical stock dividend, because the stock which was distributed was not the New Jersey company's own capital shares.

The form of the transaction, therefore, was one of a sale of all assets and a distribution by way of a dividend of a portion of the consideration received therefor.

But the form of the transaction was not in my judgment the true indication of its real nature. What took place was a reorganization, not of the New Jersey company's capital structure to be sure, but a financial reorganization of its business. Instead of amending its own charter to make possible, if it could under the New Jersey law do so, the plan of reorganization decided upon, it was found, for reasons which appealed to the responsible officers and the stockholders as good reasons, to be more desirable to provide for a new and distinct corporation which would serve as the convenient instrument to advance the plan of reorganization which all desired. The plan of reorganization formulated by the treasurer of the New Jersey company, approved and recommended by the directors and authorized by the stockholders, together with the official explanation given contemporaneously with the events, and the circumstance that the entire personnel of officers, employees and stockholders was carried over bodily so to speak to the new corporation—all show conclusively to my mind that there was in every essential matter of substance not a sale of the old business, but simply a reorganization of the same. This view, I am aware, does not appear to be in harmony with what was said in the majority opinion in *U. S. v. Phellis*, 257 *U. S.* 156, 42 *S. Ct.* 63, 66 *L. Ed.* 180. It is with diffidence that I venture to appear to be unwilling to accept without question any views not only of law but as well of fact which the Supreme Court of the United States seems to entertain. I venture to do so here, however, because it seems to me that views of fact rendered in a tax cause are not entitled to be

persuasive when the rival equities of life tenants and remainder-men are involved in a controversy dealing with property rights.

And so I regard the so-called sale as nothing more than the form which was desired in order to effectuate the purpose of re-organizing the business which the corporation owned but which, equitably speaking, belonged to the stockholders. It was simply a plan whereby the old business should go forward into the future as in the past and all its old stockholders should continue to go along with it with the same relative rights as they had theretofore respectively enjoyed.

This being so, the dividend of 200 per cent., though declared in stock of a new company, is to be tested for the nature of its origin just as though the new company had never been formed and the re-arrangement of the New Jersey company's capital had been ef-fectuated by way of amendment of its own charter increasing its authorized capital and the ensuing declaration of a 200 per cent. dividend payable in its own common stock. In other words, all that was done is to be regarded for the purposes of this case as having been done by the New Jersey company in dealing with its own assets and the existence of the new company and the formality of sale to it are to be disregarded.

Taking the view then that the ultimate destination of the 200 per cent. dividend paid in the Delaware company's stock should be governed by what would be the result had the New Jer-sey company so reorganized itself as to declare a like dividend of 200 per cent. payable in its own capital stock, it now becomes necessary to examine the evidence for the purpose of seeing what source such a dividend would have had to have been drawn from out of the New Jersey company's assets. Would it have come from surplus or from what is properly regarded as capital?

To answer this question we must refer to the financial state-ments of the company. In the ensuing discussion I shall assume, as did the parties at the argument, that whenever a surplus of profit and loss is mentioned in financial statements, the expression means accumulated earnings. On September 30 the statement of assets and liabilities showed a surplus called profit and loss in the statement of $29,955,799.36. On the same day the common capital stock account shows a liability of $29,427,282.55. There was then

a sufficiency of surplus to warrant a declaration to the common stock of a 100 per cent. dividend payable therefrom in the company's common stock. If, therefore, a 200 per cent stock dividend had been declared, practically one half thereof would have been an intrenchment upon capital. In that event one half of the dividend would belong to the remaindermen because made out of capital and the other half would belong to the life tenants, under the rule of *Bryan v. Aikin*.

But on the next day (October 1) the statement of assets and liabilities of the New Jersey company showed an entirely different surplus. It then showed a surplus, called profit and loss on the statement, of $59,107,916.11, enough to warrant a 200 per cent. stock dividend to the common stock payable out of the surplus without any intrenchment upon capital. The manner in which this doubling of surplus over night was accomplished was as follows: The Delaware company immediately upon the closing of the sale made up a statement of assets and liabilities. This statement corresponded in substance in every particular with the statement which had on the day before been made up by the New Jersey company, except in one item. The statements made by the two companies undertook to reflect the condition of the identical assets and liabilities, which certainly had not changed over night. They did so, in practically every itemized particular with the one exception referred to. That exception was the asset item, "Contracts, $29,152,116.75." This item, absent from the New Jersey company's statement of September 30 and appearing in the Delaware company's statement of October 1, supplied an asset value against which capital stock of the Delaware company could be issued in an amount in excess of the capital stock which the New Jersey Company could theretofore have issued on the strength of the financial condition of the assets and liabilities as shown by its own statement when the same were in its hands. And so, when the New Jersey company received the stock of the Delaware company in exchange for the business, the former found itself in possession of assets consisting of Delaware company's stock which when valued at par gave it a surplus or profit and loss which was nearly twice in amount what its surplus showed when it had held the assets themselves which the Delaware company's stock now stood in place of.

This being the situation, the question arises as to whether, in a case of the instant sort, where the controversy is between life tenants and remaindermen, a dividend in so far as it is declared out of that portion of surplus so constituted can be said to have come entirely out of the net earnings of the corporation. I think not. There is nothing to show that $29,152,116.75 had, at the time of the dividend, been earned on these contracts. The financial statements of both companies show a liability of $86,127,552.59 on account of "contract advances." The New Jersey company on September 30 claimed no asset value by reason of these contracts. It recognized as did the Delaware company a liability on account of unearned advances. But the Delaware company set up an asset value as stated of over $29,000,000 arising out of these contracts, which was the same thing as reducing by an equivalent amount the amount of liability due to unearned advances thereon. If in fact the $29,000,000 plus had been earned by performance *pro tanto* of the contracts, I do not see why, instead of showing the fact by an asset entry, it was not shown by an appropriate reduction of the liability item. In the absence of a showing that $29,152,-116.75 had in fact been earned, I must conclude, the liability for contract advances remaining the same, that that portion of the 200 per cent. dividend which rested upon this amount of the surplus cannot be said to have found its source in earnings and must go to the corpus. That portion of the 200 per cent. which rested upon surplus as shown by the New Jersey company's statement of September 30, is, however, traceable to earnings and belongs to the life tenants.

This conclusion is reached on the view that what took place on October 1, 1925, was in reality a reorganization of the New Jersey company. But if the transaction is to be regarded otherwise as was held in *U. S. v. Phellis*, *supra*, the result for the purposes of this case is the same. For in that event we are to think of the old New Jersey company as selling out its business with the intention of liquidating its affairs which in fact it gradually did. Regarding the matter in this light, we have then a case which falls into the class of cases above referred to, where a corporation engages in distribution of its assets in process of liquidation and where it is held that courts in passing upon the rights of life tenants and re-

maindermen must still look to the sources of the distribution for determination of the rights of those who claim it. The sources of the distribution are the same however the transaction of October 1, 1915, is to be regarded. And so in any way of looking at the matter the conclusion just announced, it would seem, is the correct one.

It is contended by some of the defendants that the entire 200 per cent. dividend must be treated as a part of the principal. If this were done, then the entire $29,995,799.36 (less a small amount) which was shown by the New Jersey company's statement of September 30 as profit and loss surplus would in effect be turned into permanent capital. This would be unjust to the life tenants who are entitled as against remaindermen to have all the earnings when turned over to stockholders regarded as income. *Bryan v. Aikin, supra.* Such a capitalization of the New Jersey company's surplus would forever remove the earnings represented by it beyond the reach of dividend distribution to stockholders. It would take it completely away from the life tenants who are entitled to earnings when distributed and by the same token would hand it over to the remaindermen. Such a result is as objectionable when done indirectly by the medium of the sale that was effected as it would be had the New Jersey company directly declared a 200 per cent. stock dividend payable in its own stock.

It is contended by others of the defendants that the 200 per cent. stock dividend is to be regarded as belonging entirely to income. This contention is equally untenable. It seems to be founded on the idea that the stock upon which it was declared was derived for the most part from parent stock which the appaisers of Mr. du Pont's estate valued on March 31, 1903, at nothing, and that anything above nothing which it eventually yielded was income. This view is more plausible than sound. It overlooks the fact that while the appraisers regarded the original stock as valueless, yet the corporation did not. On August 31, 1903, shortly after the appraisers' report, the company's statement gave it a book value of $108.89 a share. The judgment of the appraisers of the estate cannot be accepted as controlling against the value which the stockholders through their chosen officers gave to the assets where the controversy is such as we have here. Let it be assumed that the corporation's appraisal of its assets was exagger-

ated. It is not contended by any of the parties that the assets had not on September 30, 1915, come up to the claimed value. So far as appears the assets may have increased in value simply by the natural growth and increase of the company's permanent property. If so, such increase is not income but capital. *Bryan v. Aikin* recognizes this principle and cites with approval in support of it *Kalbach v. Clark*, 133 *Iowa*, 215, 110 *N. W.* 599, 12 *L. R. A.* (*N. S.*) 801, 12 *Ann. Cas.* 647. See, also, *In re McKeown, supra.*

If the contention is sound that the entire 200 per cent. dividend is income and not principal, then the result is that the trust estate ceased on October 1, 1915, to have any continuing share or interest in the powder business, for the life tenants would be the stockholders in their own right. All that the trust estate would have had left would be common stock of a non-active company which was substantially in process of liquidation, and which on final liquidation could pay to such common stock only the debenture stock of the new company on a share for share basis. Certainly it is out of all reason to say that when the 200 per cent. dividend was paid, this trust estate was ousted from all subsequent connection with the business which it had theretofore been interested in. It seems impossible to think that the sale in 1915 had the effect of sending the business forward into the future with the trust estate left behind in its wake with no further touch or contact with it.

Having indicated from the foregoing how the 200 per cent. dividend of 1915 is to be treated, I now proceed to take up for consideration the other three dividends. These may be disposed of in short order. They fall clearly within the rule of *Bryan v. Aikin* and go to the life tenants as income. The statement of facts shows them to be typical stock dividends declared out of earnings without diminishing the trust principal in any way.

Before concluding this opinion I must notice a contention made with respect to the du Pont dividend of 40 per cent. declared in 1925. Something is sought to be made by the solicitor for the defendants who are minors, out of the fact that the board of directors, before declaring that dividend, increased the asset value of General Motors Company stock which the du Pont Company held and carried in large amounts, from its cost value to $36,285,-

893.27 in excess thereof. The surplus of the company was increased by this amount, and the board resolved "that the surplus so increased be in part capitalized by a stock dividend," and in the same resolution proceeded to declare a dividend of 40 per cent. payable in common stock.

It is suggested that the 40 per cent. dividend declared in this manner must in part at least be attributed to a growth in value of the General Motors stock and that this being so the dividend cannot be said to represent earnings at least to the full extent of its face. It is to be noted however that without an increase in the asset value given to the General Motors stock there was ample accumulation of earnings to cover the 40 per cent. dividend. I can see no reason for assuming that a part of the 40 per cent. dividend must be charged against that particular part of the surplus that represented the General Motors increased valuation. The dividend did not purport to be a capitalization of the General Motors increment. It was declared out of "the surplus so increased." So long as the surplus as an entirety had in it enough of earnings to support the dividend declared, it would seem that the life tenant should receive it. If later stock dividends are declared which must draw on the General Motors increment for their support, it will be in order for the remaindermen to make the claim at that time that the same should be kept in the corpus. Whether in such an event the claim would be a sound one, does not now need to be decided.

The solicitors may agree if possible on a form of decree embodying the conclusions herein expressed. After alloting the portion of the 200 per cent. dividend which goes to the life tenants as income and to the estate that part which goes as corpus, the subsequent stock dividends declared on the du Pont stock will of course follow the shares thus allotted. If the solicitors cannot agree on the terms of the decree, a further hearing will be accorded them.