MAHLON BRYAN and HENRY C. ROBINSON, Trustees under the last will and testament of James C. Aikin, deceased, Complainants below, Appellants,

*vs.*

WILLIAM AIKIN, DAVID AIKIN, JAMES AIKIN, ELWOOD POTTS AIKIN, EDWIN PALMER AIKIN, JENNIE AIKIN, JOHN S. M. AIKIN, ANNA GRIER PORTER, ROBERT J. GRIER, ELLEN GRIER BUCHANAN, ELEANOR TURNER GRIER and HARRIET ELIZABETH GRIER, heirs at law of James C. Aikin, deceased,

Defendants below, Respondents.

*Supreme Court, on appeal, Jan. T.,* 1913.

Where a corporate stock was bequeathed to trustees as a part of the trust estate, in trust to pay the income and dividends to certain beneficiaries for life, with remainder over, and the corporation retained surplus earnings and invested them in additional real property and improvements, and thereafter capitalized the same by issuing a stock dividend, which did not affect the value of the original stock, nor materially affect the rights of the original stockholders, such new stock should be regarded as income, passing to the life tenants, and not as capital, belonging to the remaindermen.

Though a corporation may reserve a portion of its net earnings for a period of years and treat them as capital, either retaining them in its treasury or investing them in securities or other property for the company,

yet if it subsequently divides such earnings among stockholders, by declaring a dividend in cash, stock, or both, it will be regarded as a distribution of profits; the earnings so distributed not being regarded as capital, though they had been so treated by the corporation prior to distribution.

As applied to corporations, the word "capital" does not mean the corpus of the property or the stock, but with reference to new stock, issued as a stock dividend, is property or corpus; the property of the corporation being its real capital. The word means one thing in connection with the corporation, and a different thing with reference to the stockholder, since the corporation owns the property, its capital, while the stockholder owns the stock, his capital; the stockholder having no capacity to own the property of the corporation, or even its earnings, until they are declared in the form of dividends.

Argued before PENNEWILL, C. J., and BOYCE, CONRAD, WOOLLEY and RICE, J. J.

*H. H. Ward*, for the appellant.
*Benjamin Nields* and *Willard Saulsbury*, for the appellees.

PENNEWILL, C. J.    James C. Aikin by his last will and testament, dated the thirteenth day of May, 1874, and probated on the twenty-second day of July, 1884, devised all the rest and residue of his estate to his wife, Elizabeth S. Aikin, and his friend, Victor duPont, upon the following trust:

"That the said Elizabeth S. Aikin shall receive the interest, dividends, rents and income thereof for her sole and separate use during the term of her natural life, * * * and after the death of the said Elizabeth S. Aikin upon this further trust for the said surviving Trustee to invest the personal estate securely and to collect the dividends and interest thereof, and to let and manage the real estate and to collect the income thereof, and after paying all just charges and expenses including a reasonable compensation to the said Trustee for his care and trouble to pay over the net income, interest and dividends half yearly in equal shares to my granddaughter, Elizabeth Morrison Bryan and my niece, Annie Grier, for and during the term of their natural lives for their sole and separate use. * * * And if either of them the said Elizabeth M. Bryan or Annie Grier should happen to die without leaving issue to survive her then upon trust to hold the whole trust estate for the benefit of the survivor of them upon the same trusts, * * *.

"And if both of them should happen to die without leaving issue to survive, then upon trust to transfer and convey in fee simple the said

residue of my estate, free from any trust, to such persons as would have been entitled to take the same from me by the intestate laws of the State of Delaware if I had died seised thereof in fee simple, intestate, unmarried and without issue."

Elizabeth S. Aikin, the testator's wife, and the first beneficiary for life under the trust, died before the testator. Elizabeth M. Bryan, who, with Annie Grier, was beneficiary under the trust after the death of the wife, is also dead, leaving no issue. Annie Grier, who intermarried with Thomas K. Porter, still survives, and is entitled, under the terms of said trust, to have, receive and enjoy the net income, interest and dividends accruing from the property included in the trust. The defendants are the persons who would be entitled, under said will, in case of the death of Annie Grier Porter without issue, to take the property included in the trust estate under the intestate laws of the State of Delaware as if the testator had died seised thereof in fee simple, intestate, unmarried and without issue. Victor duPont, the surviving trustee, died in 1888, and Mahlon Bryan and Henry C. Robinson, the complainants, were appointed by the Court of Chancery on the twenty-fifth day of September, 1888, trustees under said will, and duly qualified as such.

The trustees, prior to the adoption by the directors of the Delaware Railroad Company of the resolution hereinafter mentioned, held as a part of the trust estate sixty-three shares of the capital stock of the Delaware Railroad Company, a part of which was bought by the testator in his lifetime and passed under his will, and the remainder was purchased by the trustees after his death. The par value of said stock was $25 per share. The trustees paid for thirty-two shares $31.75 per share, and for seventeen shares $35 per share.

On the twenty-first day of February, 1910, the board of directors of the Delaware Railroad Company adopted the following preamble and resolution:

"Whereas, by resolution of this Board, adopted January 13, 1910, it was declared in the judgment of the Board proper and advisable that an additional increase should be made in this Company's capital stock to

the extent of 83,642⅔ shares of the par value of $25 per share, aggregating $2,091,060, for the purpose of its issuance and distribution at par as a stock dividend to and among the holders of this Company's capital stock, according to their respective holdings, for and on account of expenditures and appropriations out of the Company's surplus earnings from and including the year 1897, to and including the year 1909, made for and in the purchase of additional real estate and substantial betterments and improvements to the Company's railroads and appurtenances, costing, in the aggregate, $2,100,000; and by the said resolution the question of such increase of capital stock and the issuance and distribution thereof as a stock dividend as aforesaid was directed to be submitted to the Company's shareholders for consideration and appropriate action at a special meeting called for that purpose, to be held on the fifteenth day of February, 1910;

"And whereas, the said question was submitted to, and considered by, the stockholders at the said special meeting, and the said increase of capital stock and the issuance and distribution thereof as a stock dividend to and among the Company's stockholders were duly consented to, authorized and approved; therefore

"Resolved, that an extra dividend out of this Company's net earnings accruing prior to November 1st, 1909, of twenty per centum in cash and seventy per centum in capital stock be and the same is hereby declared to and among this Company's stockholders, according to their respective holdings, as they shall stand registered at the close of business on the twenty-third day of February, 1910, the same to be payable on and after the twenty-eighth day of February, 1910; and an actual increase in the Company's capital stock to the extent of 83,642⅔ shares, aggregating at their par value $2,091,060, and the issuance and distribution thereof for and on account of the stock dividend hereby declared, be and the same are hereby authorized, and the proper officers of the Company are hereby expressly empowered and directed to take all such steps and proceedings as shall be necessary and proper to effectuate this resolution."

In the dividend declared under said resolution the trustees received in cash the sum of $315, and in stock forty-four full shares and a fractional stock scrip certificate for one-tenth of one share. Subsequently to the declaration of the dividend in question the market value of the stock of the Delaware Railroad Company, as fixed by public auctions in February and March, 1910, ranged from $48.50 per share to $49.50 per share; the higher price being under sale of later date. The market value of the stock, therefore, subsequent to the declaration of the dividend, was substantially greater than the prices paid therefor either by the testator or the trustees.

The preamble and resolution above quoted are very definite and explicit. It clearly appears therefrom, the life tenant contends, that both the cash dividend and the stock dividend were declared out of the net earnings of the corporation accruing prior to November 1, 1909, and that they constituted a reimbursement to the stockholders for and on account of expenditures made in permanent improvements to the company's property out of its surplus earnings, aggregating $2,100,000. This is denied by the appellees, who aver in their answer:

"That the ownership of said surplus earnings was vested in the Delaware Railroad Company, and that said stockholders had no property, or right of property, in or to said surplus earnings; that the interest of each stockholder in and to said surplus earnings consisted only in the right to a proportionate part thereof when and as dividends might be declared by the corporation during its existence under its charter; that said surplus was earned by said corporation and expended and appropriated for and in the purchase of additional real estate and substantial betterments and improvements to the company's railroad and appurtenances; that said stockholders did not furnish or supply to or for said corporation any money, property or thing of value whatsoever for or towards said company's surplus earnings, and therefore said stock dividend did not constitute a reimbursement to the stockholders as alleged."

It is further averred by the appellees in their answer "that the said increase in the shares of the company's capital stock to the extent of $83,642^2/_5$ shares represented the additional real estate and substantial betterments and improvements to the company's railroads, costing in the aggregate $2,100,000; that said real estate, betterments and improvements were, at the time of the adoption of the resolution, part of the corpus of said corporation, which was controlled and managed as a part of the fixed capital of said corporation, and that by the increase of the company's capital stock to the extent of $83,642^2/_5$ shares, aggregating at their par value $2,091,060, the corporation capitalized the said sum by the issuance of capital stock therefor."

The facts set forth in the bill of complaint, and which we have stated substantially, and sufficiently for the purposes of this case, are not materially controverted, except as above

stated. It is the law, applicable to the admitted facts, upon which the parties so widely and seriously differ.

The real question for determination is whether the stock dividend above mentioned is income payable to the life tenant within the meaning of the will of the testator and the law, or whether it constitutes a part of the capital of the trust estate, which by the will is to go to the remaindermen upon the expiration of the life tenancy. In order to make a proper and legal disposition of said stock dividend the complainants filed a bill in the court below praying for a construction of said will, and for instructions respecting their duties in the premises. By the decree of the Chancellor the trustees were instructed to hold the new shares of stock as an investment of a part of the principal of the trust estate. From said decree an appeal was taken to this court, which is the subject now under consideration.

What principle or rule of practice shall be adopted by courts of equity in this State in determining whether the life tenant or the remainderman shall be entitled to a stock dividend, declared out of net earnings accumulated during a term of years and used by the company in the purchase of real estate and in the improvement of its property, when it appears that neither the principal of the trust estate nor the income thereon, so far as the shares held as principal are concerned, have been diminished by reason of such dividend? Although a similar question has been frequently before the courts of England and some of the states of this country, it is a new one in this State. In the discussion of the question by American courts three principal rules have been considered, viz: The English rule, the Massachusetts rule, and the Pennsylvania rule. Each of these rules has been changed or modified to some extent by later decisions, even in the jurisdictions where first declared.

The English rule briefly stated is that ordinary dividends go to the life tenant; extraordinary or unusual dividends to the remainderman. Later English decisions, however, are to the effect that extraordinary cash dividends may be decreed to the life tenant. In the leading case of *Bouche v. Sproule,*

*L. R.* 12 *App. Cases* 385 (1887), Lord Herschell, in considering the question whether the company did in fact distribute the accumulated profits as dividend or convert them into capital, said: "I think we must look both at the substance and form of the transaction." In the much earlier cases of *Paris v. Paris*, 10 *Ves. Jr.*, 184, Lord Eldon not only disapproved of the distinction which the original rule made between usual and extraordinary dividends, but also attacked the alleged distinction between profit dividends in capital stock and in money, saying: "As to the distinction between stock and money, that is too thin."

The original English rule has never had any standing in American courts, but we think that even under the English authorities, a stock dividend is not necessarily capital of the trust estate. It depends upon the substance as well as the form of the transaction. The Massachusetts rule regards all cash dividends, however large, as income, and stock dividends, however made, as capital. *Minot v. Paine*, 99 *Mass*. 101, 108, 96 *Am. Dec*. 705, and other cases in that State. Under this rule it makes no difference when the dividend was earned, provided it was declared out of the net earnings of the company during the life tenancy; and this principle has been followed with remarkable consistency, in its important feature, by the Supreme Court of the State since the rule was first declared.

The Pennsylvania rule, as declared in *Earp's Appeal*, 28 *Pa. St*. 368, is as follows:

"Net earnings, when declared as dividends, whether in stock or in cash, belong to the life tenant, provided that such earnings have been made, or have accumulated, since the stock in question was held as a part of the trust estate."

This rule, it will be observed, differs from the Massachusetts rule in two important particulars, viz: (1) It makes no difference whether the dividend is declared in stock or in cash. (2) It does make a difference when the earnings were made or accrued, for the dividend would not go to the life tenant unless declared out of net earnings made or accrued during the existence of the life tenancy. It cannot be said

Bryan, et al., Trustees vs. Aikin, et al.    453

Opinion.

that there has been any definite rule generally recognized by the courts of this country in determining whether a stock dividend shall go to the life tenant or remainderman.  That which is sometimes termed the American rule is the Pennsylvania rule, modified by the elimination of its apportionment feature. It would be difficult, and perhaps unprofitable, to attempt to make a classification of the states with respect to the adoption of one or the other of the rules above mentioned.  It may be said that the Massachusetts rule has been substantially followed by the Supreme Court of the United States in *Gibbons v. Mahon*, 136 *U. S.* 549, and also by the courts of Connecticut, Rhode Island, Maine and Illinois, as appears from the decisions in those states.  It is equally clear that the Pennsylvania rule, or the so-called American rule, has been approved and acted upon by the courts of a larger number of states, including New York, New Jersey, Maryland, Kentucky, Tennessee, South Carolina, Iowa and New Hampshire.

It may be truthfully said that the courts of most states, especially in recent decisions, have not followed strictly either of the two principal rules of which we have spoken, but rather have differed from both in that they have repudiated the apportionment feature in the Pennsylvania rule, and also hold that a real stock dividend may go to the life tenant, which is contrary to the Massachusetts rule.  We are not bound by any rule adopted in another jurisdiction, except to the extent that the reasoning in its support commends itself to our judgment.  We conceive it to be our duty to adopt one of the rules above mentioned, in its original form, or so modified as to be reasonable and just both to the life tenant and the remainderman, and in keeping with the intention of the testator as expressed in his will.  If possible, the rule so adopted should be such as not only to govern this case, but also furnish a guide for trustees in the execution of other trusts of like character. And we assume that the court should recognize and act upon the following propositions which will not be disputed, viz:  :

1.  That the intention of the testator must be carried out, so far as can be under the law.   2.   That it was the intention of the testator in the present case that the capital or principal of

the property left in trust should be kept unimpaired for the remaindermen, and that all dividends declared thereon out of the profits or net earnings should go to the life tenant.

As was said by the court in *Boyer's Appeal*, 224 *Pa. St.* 144, 73 *Atl.* 320 (1909):

"After all, the rule for the determination of controversies over dividends, between life tenants and remaindermen, should be to give to each just what the donor intended each to have. As has been said, the intent of the grantor or testator is the pole star for the guidance of the courts."

The testator in the present case directed that his wife should receive the interest, dividends and income of the trust estate during her natural life. There can be no doubt that such language is broad enough to cover stock dividends, and that it clearly evinces an intention on the part of the testator that such dividends should go to the life tenant if declared out of net earnings. Was the "stock dividend" declared out of the net earnings? Were there, at the time the dividend was declared, net earnings that could be distributed? They had been previously expended in the increase and improvement of the permanent property of the corporation. Did such use or expenditure so change their character that no dividend could be afterwards declared thereon? Was the so-called stock dividend, therefore, no dividend at all in fact, but only an evidence of the company's increased capital created by the appropriation it had made of net earnings which would otherwise have been distributed as dividends? Unquestionably the stock dividend in question was declared and issued by the company for and on account of expenditures and appropriations out of the company's surplus earnings. That is expressly stated in the resolution by which the dividend was declared; and it is also clear that it was the purpose of the company to reimburse or make good to the stockholders the earnings, which, from year to year, instead of being distributed as dividends had been applied to permanent improvements. There can be no doubt that such was the intention, but some courts hold that it is the legal effect of the act and not the intention of the company that must control.

For over 12 years the life tenant was deprived of dividends which might have been paid to her out of net earnings if they had not been expended in permanent improvements. Such expenditure was manifestly for the benefit and advantage of the remaindermen, and not of the life tenant, because the value of the corpus of the company's property was thereby, and to that extent, increased. And presumably the value of the shares was likewise increased, and this also was to the advantage of the remaindermen only, because the dividends were not increased. The extra dividend of twenty per cent. in cash and seventy per cent. in capital stock, was declared out of the same fund, and for the same purpose. This fund had been created from the net earnings of the corporation accruing during a certain period of years, and was held as a part of the general assets, whether allowed to remain in the treasury of the company, whether used in the purchase of securities, or expended in permanent improvements. If the profits had been paid out from year to year to the stockholders, as might have been done, it would not of course have constituted a division of capital stock. If they had been invested in the stock or bonds of this or other companies, and such stock or bonds had been sold and a dividend declared out of the proceeds, or declared in such stock or bonds, such dividend would unquestionably have gone to the life tenant, even under the Massachusetts rule. Could there be any difference in principle between a stock dividend declared while the company held such securities as a part of its assets, and a cash dividend declared after the conversion of the securities? We think not, because in the one case the corporation held, as a part of its assets, securities purchased with net earnings, and in the other case it held, likewise as a part of its assets, the net earnings themselves unappropriated and uninvested.

As was said by the court in the well considered case of *Robinson's Trust*, 218 *Pa. St.* 481, 67 *Atl.* 775, (1907):

"* * * The payment of any dividend by a corporation in active operation, takes away a portion of the assets which have been temporarily increased by the earnings, and just to that extent the value of the shares in the market may be lessened. But that fact can have no relevancy in

determining the question of whether the dividend is to be regarded as income, to the life tenant, or as capital for the remainderman. That question is to be determined by the origin of the fund from which the dividend is paid."

There seems to be no dissent from this proposition, except in those jurisdictions where it is rigidly held that every stock dividend must go to the remainderman regardless of how or when it was made. But it is very certain that in the more recent decisions, even by those courts which have followed the Massachusetts rule, this rigid doctrine has been to some extent relaxed, and the judicial purpose now is to ascertain the character of the transaction which formed the basis of the dividend declared. Indeed, it may be said that in all states where the question has arisen, the question, whether a dividend, in stock or in cash, shall go to the life tenant or remainderman, depends very much upon the real purpose and character of the corporate act. For example, while it is true that in almost every case a cash dividend, whether usual or extraordinary, belongs to the life tenant, yet if it appears that the cash so distributed was derived from a sale of a portion of the real estate of the corporation as it existed prior to the trust, it will go to the remainderman, because it was not paid out of profits, but out of the corpus of the property.

In Massachusetts a dividend which is apparently a stock dividend is sometimes held to be a cash dividend, and *vice versa.* In *Leland v. Hayden, et al.,* 102 *Mass.* 542, where surplus earnings had been expended in the purchase of the capital stock of the company, and such shares were distributed among the stockholders, it was held to be a cash dividend, but a distribution at the same time of newly created shares was regarded as a stock dividend. The language of the court in that case expresses more clearly, perhaps, than any other, the reason for the rule, and the real ground upon which it is based. The court said:

"The purchased shares represented cash invested so as to earn an income. If the directors had sold them and divided the avails, there could have been no doubt that it was a cash dividend. Or if the invest-

ment had been in the stocks of other corporations, and the stocks divided, it would have been the same. As it was, the dividend did not affect the value of the shares upon which it was made, relatively to the whole capital stock of the company. The shares originally held by the trustees constituted the same fractional part of the whole capital stock after the dividend, as before. In substance, as well as in intent, it was a cash dividend, though it was not such in form; and the substance and intent must govern the transaction.

"The newly created shares constituted an increase of the capital stock of the company, and affected the relative value of the shares held by the trustees. They held a smaller proportion of the whole capital stock after the creation of the shares than before."

In the case of *Heard v. Eldredge*, 109 *Mass.* 258, 12 *Am. Rep.* 687, the fund distributed represented a portion of the property of the corporation which had been taken by the city under the power of eminent domain, and was called by the directors a "cash dividend." The court said:

"The suggestion that the intention of the directors should determine the question whether the dividend is capital or income cannot be correct. * * * It is more safe to look at the character of the property and the transaction."

So it appears that, in Massachusetts, a dividend based on net earnings and paid in the stock of other companies, or in its own stock, would go to the life tenant provided the capital stock of the company was not increased thereby. In substance and effect the transaction would be regarded as a cash dividend; and the character of the transaction will be carefully examined in order to ascertain its real meaning and purpose. The fact that the earnings had been invested in the purchase of other securities would not change their nature and make them capital so that they could not be distributed as a cash dividend. They might be so distributed, and only as cash dividends. Then we must assume that even under the Massachusetts rule the mere fact that net earnings had been invested or expended in improvements and betterments, would not so change their character as to prevent their distribution among the stockholders as net earnings.

We are now considering only the effect of the appropria-

tion of income to permanent improvements, and not whether the distribution could be made in newly created shares. It may be regarded as settled law, we think, that although a corporation has the right to set apart or reserve a portion of its net earnings for a period of years, and treat them as capital, retaining them in its treasury, or expending them in the purchase of securities, or real estate for the company, yet if it subsequently divides such net earnings among the stockholders by declaring a dividend in cash, in stock, or in both, based upon such earnings, it is a distribution of profits. When the necessity for the reservation ceases, and the reserve fund is divided among the shareholders, the question whether it was income or capital depends upon its origin, for their source is not changed by the delay in distribution. If it was originally taken from the net earnings it belongs to the tenant for life if distributed in his lifetime. In such case the accumulated income, as well as the securities and real estate purchased, are all assets of the corporation, but the earnings are not regarded as capital although they may have been treated by the corporation as such prior to the distribution.

In the present case the appellees insist that the appropriation of the net earnings to improvements constituted a capitalization of such earnings, and they could not afterwards be distributed as net earnings. They argued very strongly and plausibly, that when the earnings had become a part of the corpus of the property of the corporation, they necessarily lost their character of income and could never regain it. This argument, as well as the reasoning in the able opinion of the Chancellor, impressed the court at the hearing as being very logical and sound. But after further and more careful consideration we think the position taken by the appellees is more technical than equitable. The fact must not be lost sight of that this case is in a court of equity, and is to be decided according to the principles of equity. Undoubtedly the company had the right to withhold the earnings, and to permanently capitalize them if it deemed it necessary or proper in the conduct of its business to do so. But did it do so in this case? The court has the right, under all the authorities, to

consider the nature and character of the entire transaction in order to determine that fact, and necessarily the intention of the company is a very material element of the transaction. In view of the fact that the company still regarded the fund expended as net earnings, and sought to distribute them as such, is it not reasonable to believe that the appropriation of them, as made, was more in the nature of a loan or temporary use than a permanent capitalization? In *Robertson v. DeBru- latoor*, 188 *N. Y.* 301, 80 *N. E.* 938 (1907), the court said:

"The transaction was, clearly, a method of book-keeping adopted by the company, by which the moneys to the credit of income account in its ledger could be transferred to the new account, to represent the expendi- tures in the improvement of the company's properties, and, at the same time, the company could be made to appear as a temporary borrower of the same and, therefore, a debtor to income account. * * * The funds themselves remained, as much as ever, the property of the company and they never lost their character as earnings, or income,"

And that upon their declaration by way of dividend by the company after the creation of the trust they went to the owners of the stock at the time of the declaration of the dividend and were accountable for the trustees to the life tenant as income,

In the present case, notwithstanding the use, the net earnings were still regarded as a fund that might be distributed among the stockholders, and would be when it was considered expedient to do so. Suppose the corporation, after using the net earnings as it did, had borrowed a like sum of money and divided the same as cash dividend in place of the earnings which it had used, could anyone say that such dividend would not belong to the life tenant? We think not, even though the value of the shares was lessened by the increase of the com- pany's liabilities. Then, suppose, instead of borrowing the money the company had elected to create new shares equal in value to the amount of the net earnings it had expended, and had distributed such shares among the stockholders in place of the net earnings which it had borrowed or used, could it be said that in equity such shares should not belong to the life tenant? We think not, unless the reasoning in support of the Massa- chusetts rule convinces to the contrary.

This brings us to a consideration of what we regard as the crucial point in the case, for upon the questions already discussed we think there is no essential difference in the cases. But under the decisions in Massachusetts, and a few other states that have followed the same rule, if the transaction of the corporation involved the creation and issuance of new shares of capital stock, the distribution thereof among the stockholders would be regarded, not as net earnings, but rather as an apportionment of increased capital. The reason for so holding is simply this, as we have before stated: "That the newly created shares constituted an increase of the capital stock of the company, and affected the relative value of the shares held by the trustees," etc. This reasoning, or basis of decision, we submit constitutes the only real distinction between the conflicting rules respecting cash and stock dividends. Although some courts and text-writers have said that Massachusetts has departed from its rule as first declared, we do not find that there has been any departure respecting the disposition of dividends declared in new shares. The courts of that state do look at the nature of the transaction, but only for the purpose of ascertaining whether the dividend was in substance and effect a cash or stock dividend. If, when so tested, it proved to be a stock dividend in fact, it has been uniformly held to belong to the remainderman and not to the life tenant; and such courts have invariably decided that a dividend declared in newly created shares is an apportionment of capital and not a distribution of income. We must, therefore, regard the Massachusetts rule as in irreconcilable conflict with the Pennsylvania rule, or the so-called American rule, which makes no distinction between stock dividends and cash dividends when based on net earnings.

Some courts have held that the question of ownership of stock dividends is solely between the life tenant and the remainderman, there being no prerogative of the corporation involved, and have declared that even though the corporation has, so far as it could, capitalized its net earnings through the medium of stock dividends, such act would not deprive the life tenant of the net earnings so capitalized. In other words, that even

though net earnings are capitalized so far as the corporation is concerned, they are not as between the life tenant and remainderman because the intention of the testator must control. In *Pritchitt v. Nashville Trust Co.*, 96 *Tenn.* 472, 36 *S. W.* 1064, 33 *L. R. A.* 856, the court said:

"Undoubtedly the action of the gaslight company, in converting net earnings into capital stock, gave them that character and status for all corporate purposes. But did it have any legal effect beyond that? Does it follow that they were converted into technical corpus, as between the life tenant and the remaindermen owning a portion of the original stock? We think not.

"When property is given to one person for life, with remainder to another, the former is entitled to the use for the period limited, and the latter to the corpus after that time. Neither may encroach upon the right of the other. The life tenant may not diminish the corpus nor the remaindermen the use, and what they may do themselves, others may not do for them. The life tenant may not be deprived of the use to augment the corpus, nor the remaindermen of the corpus to augment the use. The right to the use of the property entitles the life tenant to its net income. As applied to land, it entitles him to the crops or rent; as applied to money, or bonds, it entitles him to the interest; and as applied to corporate stock, it should, upon the same reasoning, entitle him to the net earnings. If the life tenant may not be deprived of crops or rents to make the land better, or of interest to enlarge the corpus of money or bonds why should he be deprived of net earnings of corporate stock, covered by stock dividends, to augment the remainder estate? It does not seem to us a sufficient answer to say that the corporation, in the latter case, has seen fit, in the due exercise of its power, to capitalize such earnings, rather than pay them out in cash dividends. What has the capitalization of the earnings to do with their ownership as between life tenant and remainderman, or how can the change of form affect the title of those persons? Can the corporation, after earnings have been made and ascertained, give them to one person by this procedure or to another by that procedure? Certainly not. Though endowed with the largest discretion in the honest management of its business, and allowed at pleasure to convert its net earnings into capital stock through the medium of stock dividends, a corporation cannot, by that act, in our opinion, turn any portion of those earnings from the life tenant to the remainderman of original stock.

\* \* \* \*

"Special words were not necessary to vest the life tenant in this case with a right to stock dividends. The general bequest had that effect. Special words would have been necessary to deprive her of them, just as

special words would have been required to deprive her of income on realty devised.

"Had the testator lived, these stock dividends would, unquestionably, have been income to him, upon his investment in the original shares; having died, they were, for the same reason, income to his estate, as owner of the same investment. The income of that part of his estate, during her life, was bequeathed to his widow; hence she, as life tenant, became the owner of these dividends in as full a sense as he would have owned them."

In *Hite v. Hite*, 93 *Ky.* 257, 264, 265, 266, 20 *S. W.* 778, 19 *L. R. A* 173, 40 *Am. St. Rep.* 189, the court in speaking upon the same subject, said:

"As between the company and the shareholder the action of the directors in determining whether the earnings shall be capitalized in stock dividends or paid out in cash, is conclusive; but when once declared, although in the form of stock, it is the province of the law to determine whether they belong to the corpus of an estate and are to benefit the remaindermen, or whether they shall go to the life tenant as income.

\* \* \* \*

"Where a dividend, although declared in stock, is based upon the earnings of the company, it is in reality, whether called by one name or another, the income of the capital invested in it. It is but a mode of distributing the profit. If it be not income, what is it? If it is, then it is rightfully and equitably the property of the life tenant. If it be really profit, then he should have it, whether paid in stock or money."

Continuing, the court said:

"A singular state of case—it seems to us an unreasonable one—is presented, if the company, although it rests with it whether it will declare a dividend, can bind the courts as to the proper ownership of it, and by the mode of payment substitute its will for that of the testator, and favor the life tenant or remaindermen, as it may desire. It cannot, in reason, be considered that the testator contemplated such a result. The law regards substance, and not form, and such a rule might result not only in a violation of the testator's intention, but it would give power to the corporation to beggar the life tenant."

*Thompson on Corporations (Vol.* 2,) § 2222, in criticising the Massachusetts rule, says:

"The Massachusetts doctrine seems to be a rule of mere convenience,

Bryan, et al., Trustees vs. Aikin, et al.     463

Opinion.     .

and not a rule of justice.    It loses sight of the real question under considera-
tion, what is capital of the estate disposed of by the will, and not what is
capital of the corporation; and it goes entirely beyond tenable ground
where it allows this question to be determined, not by the judicial courts
upon a view of the real substance of the case, but by a board of directors,
that is, by a committee of persons entirely foreign to the will, in passing a
resolution declaring a dividend."

The same text-writer, at *section* 2192, expresses the truth,
and a very clarifying truth, when he says:

"Instead of attempting to lay down a hard and fast rule on the sub-
ject which shall be applicable to all cases—and herein lies the chief mis-
take which the courts have made in dealing with it—it should be deter-
mined upon the consideration of the actual nature of the dividend in each
particular case."     .

It is perhaps not necessary or profitable to quote from
many authorities which are to the same effect, but we wish to
refer to two or three other cases; and first, the leading case in
opposition to the Massachusetts rule, and the one in which
the Pennsylvania rule was first declared, viz., *Earp's Appeal*,
already mentioned.    The court in that case, at *page 374*, said:

"It is equally clear that the profits arising since the death of the
testator are 'income' within the meaning of the will, and should be dis-
tributed among the appellants.    *  *  *    That sum is the rightful prop-
erty of the appellants.    The managers might withhold the distribution of
it for a time, for reasons beneficial to the interests of the parties entitled.
But they could not, by any procedure whatever, deprive the owners of it,
and give it to others not entitled.    The omission to distribute it semi-
annually, as it accumulated, makes no change in its ownership.    The
distribution of it among the stockholders in the form of new certificates
has no effect whatever upon the equitable right to it."

In *Riggs v. Cragg*, 26 *Hun.* (*N. Y.*) 89, 103, a stock divi-
dend had been declared as in the present case, and the court
spoke of it as follows:

"The weight of authority appears therefore to be decidedly    *  *  *
to regard stock dividends, made in the manner in which they were declared
as simply another mode for the distribution of the surplus earnings of
the company among its stockholders, instead of actually paying the

money itself to them.    As the term dividend is ordinarily employed and understood it may properly include dividends of this character, and they must therefore he held to have been within the contemplation of the testator  * * *."

The same decision was made in another case from the same State, which is regarded as a leading authority on the subject in this country—*McLouth v. Hunt*, 154 *N. Y.*, 179, 194, 48 *N. E.* 548, 39 *L. R. A.* 230.   The court in the course of a very exhaustive opinion, which reviewed, practically, all the cases, including the United States Court case of *Gibbons v. Mahon*, said:

"Moreover it is by no means clear that the decision in this case is in conflict with the case of *Gibbons v. Mahon, supra.*   The rule for the determination of the question whether stock dividends were to be treated as income or an apportionment of capital, was stated by the learned justice in the following language: 'When a distribution of earnings is made by a corporation among its stockholders, the question whether such distribution is an apportionment out of additional stock representing capital, or a division of profits and income, depends upon the substance and intent of the action of the corporation as manifested by its vote or resolution.' * * * It was, therefore, the substance and intent of the corporate action to distribute earnings rather than apportion additional capital.   There was, in fact, no additional capital added.   * * *   The Western Union Telegraph Company had no more property after passing this resolution than it had before, and, hence, no more capital.   When the resolution was carried out it had, indeed, more capital stock outstanding, as represented by certificates, but not a single dollar had been added to its capital."

The court declares that the reasoning of the Kentucky and Tennessee cases, above mentioned, is

"* * * Far more cogent and persuasive than anything to be found in the cases which favor the contrary rule.

*    *    *    *

"For all corporate purposes the corporation may doubtless convert earnings into capital, when such power is conferred by its charter, but when a question arises between the life tenants and remaindermen concerning the ownership of the earnings thus converted the action of the corporation will not conclude the courts."

The courts of Maryland, Iowa and New Hampshire have been equally as strong as those of Kentucky and Tennessee in their repudiation of the Massachusetts rule, and in their support of what is called the American rule, which may be stated thus: All net earnings, howsoever they may have been treated or used by the corporation during their accumulation, and regardless of the period during which they have accumulated, if declared as dividends out of net profits during the life tenancy, are given to the life tenant, whether such dividends are made in cash or capital, provided that the principal of the trust fund is not diminished thereby. *Thomas v. Gregg,* 78 *Md.* 545, 28 *Atl.* 565, 44 *Am. St. Rep.* 310; *Atlantic Coast Line Div. Cases,* 102 *Md.* 73, 61 *Atl.* 295; *Kalbach v. Clark,* 133 *Iowa* 215, 110 *N. W.* 599, 12 *L. R. A.* (*N. S.*) 801; *Lord v. Brooks,* 52 *N. H.* 72.

While the courts of Massachusetts have adhered to the principle first declared in *Minot v. Paine,* so far as newly created shares are concerned, and while the federal courts would, presumably, follow the substantially similar decision made in *Gibbons v. Mahon,* we are satisfied that the strong tendency of American courts, and English too, as shown by more recent decisions, is to sustain the American, or modified Pennsylvania, rule in order to effectuate the intention of the testator as expressed in his will. Under the Pennsylvania rule, earnings made or accumulated prior to the acquisition of the stock by the trust estate became a part of the principal of the trust, and all earnings, when declared as dividends, made or accumulated since the acquisition of the stock by the trust estate, go to the life tenant. This apportionment feature of the rule has been found to be very troublesome, and often incapable of satisfactory enforcement. Moreover it is objectionable because it involves an investigation of the business of the company, and a determination of the question sometimes by the court upon insufficient evidence. Some courts have said they would assume that the net earnings were made during the existence of the trust in the absence of satisfactory evidence to the contrary, because the law presumes they were made at the time the dividend was declared; but many other courts have repu-

diated the apportionment feature of the rule entirely, giving to the life tenant all net earnings declared as dividends during the existence of the trust, no matter when made, and to the remaindermen all such earnings if not declared as dividends until after the life estate ended.

In *Riggs v. Cragg* the court said, at *page* 102:

"* * * Dividends are not apportionable, but are legally considered as accruing only from the time when they may be declared."

In *Hite v. Hite*, at *page* 265, this was the language used:

"It is the rule, as settled by the current of authority, that dividends, whether of stock or payable in money, are non-apportionable, and must be considered as accruing in their entirety as of the date, when they are declared. If, for instance, the life tenancy has begun when a cash dividend is declared, it belongs to the life tenant, although it may result in part from profits previously earned. It goes to him irrespective of the time when it was earned. No inquiry will, in such a case, be made as to what portion of the profit upon which the dividend was based was earned before or after the death of the testator for the purpose of apportioning it between the tenant for life and the remaindermen. The difficulty attending such an inquiry, the impossibility of attaining accuracy, and of ascertaining the many sources from which the profit has been derived, are the reasons for this rule; but it does not also follow that the declaration of the company, as to the character of the dividends, determines its legal status, and to whom it shall belong. It is the law which says that the time when it is declared shall be deemed the date of its accrual, and so it is for the law, when it is once declared, to determine its ownership."

The principle underlying these and many similar decisions, is that if the testator had lived, the dividend would have been income to him no matter when the earnings were made, and what would have been income to him should be considered, as intended by him, to be income to his beneficiary for life if declared in dividend during her life.

In *De Koven v. Alsop*, 205 *Ill.* 309, 311, 68 *N. E.* 930, 63 *L. R. A.* 587, it was said:

"No part of the earnings * * * had become a part of the testator's estate at the time of his death, no matter when they had been earned by the company. If the dividend had been paid to the testator in

his lifetime it would have been received by him as income from his stock investment. It did not become anything else when received by the trustees of his estate in the form of an extra dividend, after his decease. It was still income, like other dividends, and as such, it is payable to the life tenant under the provisions of the will."

Many courts have reviewed the decisions of the various courts in this country, and in England, respecting the disposition of stock dividends, but without much profit it seems. We will not attempt any such review, because it is impossible to reconcile the cases or make the two principal rules consistent with each other. It may be said, however, in view of later decisions, that in respect of stock dividends, the authorities differ in but one essential point, and that is in the treatment of dividends declared in newly created shares. In both Massachusetts and Pennsylvania, indeed, under all the modern decisions, the court may and should examine the nature of the corporate transaction, as well as the character of the dividend declared in order to determine whether the dividend is in fact a distribution of net earnings or an apportionment of new capital. Nowhere would it now be held that the courts are controlled by the name which the corporation gives to the dividend, or the form in which it was declared. There is no essential difference between those two states in respect to stock dividends when not declared in newly created shares, in each state the courts being controlled by the real nature of the dividends; by the fact and not by the name.

But when it comes to the declaration of a dividend in shares of the company, newly created for the purpose, the two rules are essentially different. We are inclined to believe that this difference has been caused by the difference in the decisions respecting the meaning of the word "capital." As applied to corporations does it mean the corpus of the property or the stock? If it means stock, then of course the capital is increased by the issuance of new shares. If it means "corpus," then the capital is not increased by the issuance of new shares because nothing whatever is added to the corpus. It may be also said that nothing is taken from the corpus because it remains the same after the issuance of the new shares as before.

It is entirely unaffected by the declaration of a stock dividend out of net earnings. We believe the true meaning and significance of the word "capital," as used in connection with the subject now under consideration, is property or corpus, and not capital stock. In the present case the stock dividend was declared to be, and was, based upon net earnings. It was unquestionably the purpose of the company, in declaring the dividend in question, to distribute among its stockholders, out of the same fund, a sum, partly in cash and partly in stock equivalent to the net earnings which it had used for permanent improvements, but which it, nevertheless, intended to subsequently give to the stockholders in some form. There can be no doubt, we think, that the company, intended by said dividend, to reimburse its stockholders for and on account of the profits which had been previously expended to increase the corpus of the corporation. It was a "turning back to the stockholders," as some courts have said, of net earnings which had been temporarily used for improvements. The fact that the earnings had been accumulating for twelve years did not change their nature. They were assets, it is true, and in that sense, property of the corporation, but they were also net earnings still. Could the fact, then, that the company, instead of distributing the money, used it for the benefit of the company, and distributed in lieu of it new shares, make the fund any the less net earnings? We think not, because the property of the corporation, the real capital, was not affected thereby in any way. It was neither increased nor diminished. The form of the net earnings was changed but their origin remained the same, and the intention of the testator was not altered or affected by the action of the corporation that preceded the declaration of the dividend.

We have been considering what is meant by the word "capital" of a corporation, and this is, in our opinion, entirely different from the meaning of the word when taken in connection with the testator's estate. The corporation owns the property—its capital; the stockholder owns the stock—his capital. The word means one thing in connection with the company, and a different thing in connection with the stock-

holder.  The latter does not, and cannot own the property of the corporation, or even the earnings, until they are declared in the form of dividends.  But when they are so declared, whether in cash, or in stock purchased or newly created, they are not capital of the company, but a distribution of profits which were made by the use of the corporation's capital in the prosecution of its business.  Would the increase of the capital stock, and the issuance of the new shares to the life tenant as profits, decrease the capital of the testator's estate?  This, of course, is an important consideration in the determination of the question before the court, because it was the intention of the testator, as well as the meaning of the law, that while all of the net earnings, profits and dividends from the property included in the trust should go to the tenant for life, the capital itself should be kept undiminished for the benefit of the remaindermen.

It is undisputed that the capital of the trust estate was as large after the distribution of the stock dividend as before. It was not diminished thereby to the extent of a single share, nor, so far as the record shows, was it decreased in value to the extent of a single dollar.  If the new shares are given absolutely to the life tenant, the trustees will still hold, for the benefit of the remaindermen, the same number of shares as before; the market value of such shares is not diminished, and the dividends thereon continue the same as they have been for many years.  There is not only nothing to show that the capital of the trust has been in any wise impaired, but everything, save possibly one circumstance, clearly indicates that it is intact notwithstanding the issuance and distribution of the new shares.  The one circumstance to which we refer is this: That the issuance of such a large number of new shares might diminish the value of the old shares, and, therefore, decrease the capital of the trust, which neither the law nor the intention of the testator will permit.

In support of this contention, it is very strongly and plausibly argued by some courts, that the issuance of new shares of capital stock must dilute the old shares in proportion to the extent of the new issue, and to the same extent decrease

the value of the individual shares; that in one way only could the stockholder's monetary interest be as great after the issue as before, and that is by giving to him a proportionate part of the new stock; that only in that case would his holdings bear the same relation to the entire issue of capital stock as before, because otherwise he would hold a smaller proportion of the whole capital stock.

While it may be technically true that the giving of the new capital stock to the life tenant would have the effect of causing the remaindermen to hold a small proportion of the entire capital stock, and might diminish the value of the shares, yet, according to the record, it does not appear to have had such effect in the present case. The market value of the shares, so far as the facts show, was as great after the issuance of the new shares, as before.

But conceding that the issuance of new shares to the life tenant might in some cases diminish the value of the stock held for the remaindermen, certainly it should not have that effect if the capital of the corporation, that is, its permanent property, had been correspondingly increased. It seems to us that such is exactly the situation here. The net earnings, which the new shares represented, were used by the corporation in the purchase of additional real estate, and for betterments and improvements. The expenditure, therefore, was for the benefit of the remaindermen and not of the life tenant. It increased the amount and enhanced the value of the property of the corporation, and presumably, to the same extent, increased the value of the capital stock of the corporation. And this was done at the expense of the tenant for life because it was effected by using for permanent improvements the profits which would otherwise have been given to the life tenant. The fact is that the remaindermen will not be injured, nor will their capital be impaired or diminished in value by giving the new stock to the life tenant, because the capital of the corporation, as well as the stock of the remaindermen, have been increased in value by the appropriations that were made of the net earnings just to the same extent that the stock might be diluted or diminished in value by the issuance of the new

shares. This is a point, we confess, which does not seem to have been considered by any other court, but it does nevertheless appear to us to be worthy of consideration by a court of equity in determining the rights of life tenant and remainderman under a trust.

For the reasons above stated we hold that the stock dividend in question legally and rightfully belongs to the life tenant. Such conclusion, in our judgment, carries out the intention of the testator, violates no sound rule of law, and is consistent with every principle of equity. It is fair to both life tenant and remainderman, because it practically "turns back" to the former a fund which had been diverted for the benefit of the latter; and surely in a court of equity the remainderman has no right to complain.

We do not need to dwell upon, or even mention, the effect that a contrary decision might have in some other case, for it sufficiently appears from the decisions from which we have quoted. It might be that a corporation would, for reasons deemed proper and sufficient, pay all net earnings through the medium of stock dividends, and declare no cash dividends at all during the continuance of the trust. It cannot for a moment be supposed that the testator, in creating the trust, contemplated that the person for whom he sought to provide for life should be impoverished because of the name or form in which the dividend was declared. It is much more reasonable to suppose that he contemplated that all dividends, no matter what they are called, which represented the capital of the corporation would go to the remaindermen, and all dividends, by whatever name, which represented net earnings, would go to the beneficiary for life. We believe this to be the law in this country according to the great preponderance of authority.

But we are not so much concerned about the effect of the decision in the present case as the principle upon which it is based. The rule adopted should not only be legal, but also broad and equitable. It should be convenient and practicable, and at the same time just and fair to both the life tenant and remaindermen. As far as possible it should carry out the intention of the testator. We believe the doctrine herein

approved, and acted upon, reasonably meets all of these requirements. It is the so-called "American Rule," under which, as we have already stated, all net earnings, however they may have been treated or used by the corporation during their accumulation, and regardless of the period during which they have accumulated, if declared as dividends out of net profits during the life tenancy, are given to the life tenant when declared, whether such dividends are made in cash or capital stock, provided that the principal of the trust is not diminished thereby.

The grounds or reasons upon which the rule is based are strongly and clearly stated in a very recent Iowa case as follows:

"With such divergence of opinion, it is manifest that cogent reasons may be given in support of' either of these propositions. We shall not attempt to review the cases cited in support of the different rules. He who cares to know the logic thereof may read. Our duty is performed when we establish a rule for this State which we believe best sustained on principle and by authority. That rule more nearly approximates what is called the American than any other. Under it we start with the notion that all pure dividends, whether in cash or stock or other property, are a part of the income, and, when declared, should go to the life tenant, and not to the remaindermen, as it is not a part of the corpus of the property, but a part of the income derived from the use and management thereof. Any dividends, so called, presumptively belong to the life tenant, as they are, in the absence of a showing to the contrary, assumed to have been divided as profits. If, however, the so-called stock dividends represent the corporate capital—that is, represent nothing but the natural growth or increase in the value of the permanent property, so that there is merely a change in the form of ownership—such stock should go to the remainderman; for in such cases the dividend is a dividend of capital, representing simply an increase in the value of the physical property, good will, or other thing of tangible value. This is the modified American rule announced in *Spooner v. Phillips*, 62 *Conn.* 62, 24 *Atl.* 524, 16 *L. R. A.* 461; *Hite's Devisees v. Hite's Ex'r*, 93 *Ky.* 257, 20 *S. W.* 778, 19 *L. R. A.* 173, 40 *Am. St. Rep.* 189; *Williams v. Telegraph Co.*, 93 *N. Y.* 162; *Lord v. Brooks*, 52 *N. H.* 72; *Moss' Appeal*, 83 *Pa.* 264, 24 *Am. Rep.* 164; *Thompson on Corporations*, §§2192, 2193.

"Under this rule it becomes a question of fact as to the actual nature of the dividend. The mere fact that the directors of the corporation call it either one thing or the other. is not controlling. The Masschusetts rule has also been adopted by the Supreme Court of the United States,

Bryan, et al., Trustees vs. Aikin, et al. 473

Opinion.

but has been most severely criticised, and the court which first announced it has departed somewhat from the hard and fast principle first announced. Originally the courts of that State held that the form of action taken by the corporation was conclusive; that is to say, if the stock was issued as a capital dividend, this was an end of the inquiry. But this loses sight of the real inquiry as to what is income which should go to the life tenant. * * *

"Under these rules we have announced, we start out with the assumption that these stock dividends represent income, and cast the burden upon him who claims they were of capital, and simply represent the property of the corporation, of showing that fact." *Kalbach v. Clark*, 133 *Iowa* 215, 110 N. *W.* 599, 12 *L. R. A.* (*N. S.*) 801.

Under the principle declared in that case it was held that the dividend of five shares of newly created capital stock was declared out of accumulations by the corporation and was income, and that the fifty per cent. dividend in new capital stock which represented, not net earnings, but simply the natural growth and increase in the value of the permanent property, was capital.

In the case before us the capital stock in question was issued and distributed among the stockholders for and on account of expenditures and appropriations out of the company's surplus earnings made for permanent improvements. Certainly this was the purpose of the directors of the company as shown by their resolution, and it is equally clear that such was the purpose and undertaking of the stockholders when they voted upon and approved the proposition. The question submitted to the stockholders was whether an increase of the capital stock should be made for the purpose of declaring a stock dividend on account of the expenditures for improvements that had been made out of the surplus earnings, and the stockholders assented thereto. It cannot, therefore, be said, that the stockholders then, or at any other time, understood or believed that the new capital stock issued as a dividend under said resolution would be capital and not income. They knew from the resolution upon which they voted that the dividend proposed was to be declared for and on account of expenditures that had been made by the company out of the net earnings, and assented to the proposition. They agreed

that the surplus earnings which had been used for permanent improvements might be paid to the stockholders, partly in cash and partly in stock, not as capital, but as net earnings, which was and is income. It is admitted that the part of the dividend declared in cash is income, and unless there is some magic in the word, that part which was declared in "stock" must also be income, for the cash and stock together represent one and the same fund, viz., the accumulated surplus or net earnings of a certain period of years, and logically as well as equitably they must belong to some person. And even if the stockholders did intend and believe when they voted on the proposal, or at any other time, that the accumulated surplus which had been expended in betterments and improvements would be treated as capital and not income, such intention and belief would not make such surplus capital if it was not so in law and in fact, under the provisions of the testator's will when subsequently declared as dividends in cash or in stock.

The stockholders had a right to expect that the dividend would belong to the stockholders, but no right to believe that a part of it would not belong to a life tenant who was entitled to any and all dividends that might be declared on the old stock out of net earnings. If the dividend had been declared in money instead of stock, it would have belonged absolutely to the person entitled to the dividends on the stock at the time of the declaration. Why then would not such person be equally entitled to a stock dividend which was declared for and on account of the money or net earnings which the corporation had expended? It is not a sufficient answer to say that the life tenant would receive the dividends that might be declared on the new stock, any more than it would be to say that the life tenant would be adequately protected if he received the interest on the money represented in a cash dividend. In neither case would he have the benefit of all the net earnings declared and distributed by the company in dividends during the existence of the trust.

We think it unnecessary to comment, further than we have, upon the authorities cited by the appellees. It is admitted that the two principal rules are irreconcilable. The princi-

ples declared in *Gibbons v. Mahon*, and other cases relied upon by the appellees, are for the most part fundamental and unquestioned, but they are not decisive of, or even applicable to, the particular question before us. The conclusion we have reached would be unchanged and unaffected if we should admit to be true all of those principles except that which declares newly created shares to be capital, and not income, in every case, regardless of the origin of the fund represented, or of the character and purpose of the corporate Act. The application of the doctrine would, we believe, defeat the intention of the testator in the present case as it probably has in others. The following analysis of those cases is found in the brief of the appellees, viz:

"The outcome of the cases in the Supreme Court of the United States, and of New York, Illinois and some of the other states, is that the solution of the question is crystallized in the action of the corporation."

We believe that our decision of this case is entirely consistent with the action of the corporation as shown by the resolution referred to. It is upon such action, and the intention of the testator as expressed in his will, that we have grounded our decision. And, moreover, we are convinced that the conclusion we have reached is in harmony with the decided weight of authority as shown by the more recent decisions, including those of our neighboring states.

The decree of the Chancellor is reversed.

BOYCE, J. (dissenting). I am constrained to dissent from the very able opinion of the majority of the court.

The only assignment of error to the decree of the Chancellor is: "That the court erred in that it held and decreed that the said dividend of seventy per centum in capital stock of Delaware Railroad Company declared, pursuant to the resolution of said company, adopted on the twenty-first day of February, A. D. 1910, to and among said company's stockholders, according to their respective holdings, amounting to $44^1/_{10}$ shares, should be held by said complainants in trust to apply the net interest, income and dividends accruing thereon

to the said Annie Grier Porter for and during her life, and upon her death to be distributed and disposed of to the tenant or tenants in remainder according to the provisions of the last will and testament of James C. Aikin, deceased, and instructing said complainants in accordance therewith." The facts and questions presented appearing in the majority opinion, it is unnecessary that I should repeat them. I shall not enter into any extended discussion of the question which is presented to this court for the first time. The question is not, however, a new one. It has received the attention of many courts; but there is great conflict in the decisions. I shall not review or cite them, as they will be easily found. For a summary and classification thereof, reference is made particularly to the valuable notes in 9 *Ann. Cas.* 290, 12 *Ann. Cas.* 650, 23 *Ann. Cas.* 1218 and 118 *Am. St. Rep.* 162.

In determining the rights of persons in interest in cases of this character, the courts are in accord in holding that the intention of the testator, if it can be ascertained, must control. When, however, such intention is not manifest, the question whether new stock issued and distributed to stockholders, as in this case, should, as between remaindermen and tenants for life, be regarded as capital, forming a part of the trust estate, or as income, belonging to the tenant for life, has perplexed the courts. In England, if the corporation may legally increase its capital stock, the law gives stock dividends, conveniently so called, to the remainderman, and cash dividends to the life tenant. In this country, the courts that have considered the question may, with reference to their conflicting views, be divided into, at least, three groups. What is known as the Massachusetts rule, which is similar to the English doctrine, looking to the substance and not to the mere form of a new issue of stock, regards an issue, such as was made in this case, as a part of the corpus and allots it to the remainderman. This rule obtains in a number of jurisdictions, including the Supreme Court of the United States. Under what is known as the Pennsylvania rule, adopted in other jurisdictions, the question is whether the issue of new stock is based upon surplus earnings. If so, no distinction is made between stock

and cash dividends. But apportionment is made between the life-tenant and the remainderman according as to the time when the earnings were accumulated with respect to the creation of the trust fund. Other jurisdictions recognize the latter rule in making no distinction between stock and cash dividends, but disregard the principle of apportionment, deeming all dividends based on surplus earnings, whether accumulated before or after the creation of the trust estate, as income belonging to the life tenant. It is this last rule which the majority of the court have adopted.

It is a plain principle of law, recognized, I believe, by all the courts, that "money earned by a corporation remains the property of the corporation, and does not become the property of the stockholders, unless and until it is distributed among them by the corporation. The corporation may treat it and deal with it either as profits of its business, or as an addition to its capital. Acting in good faith and for the best interests of all concerned, the corporation may distribute its earnings at once to the stockholders as income; or it may reserve part of the earnings of a prosperous year to make up for a possible lack of profits in future years; or it may retain portions of its earnings, and allow them to accumulate, and then invest them in its own works and plant, so as to secure and increase the permanent value of its property;" and, unless in case of fraud or bad faith, its discretion in this respect cannot be controlled by the courts.

I am of the opinion that the rule adopted by the majority of the court, and the Pennsylvania rule as well, disregard the logic of these fundamental principles. Accumulated earnings, or undivided profits, until distributed by the corporation are assets and form a part of the corpus of the corporation; and by a stock dividend, such as was authorized in this case, there is, in fact, no distribution of surplus earnings to the stockholders. In this case, if the so-called stock dividends should be held as part of the corpus of the trust estate, as I think they should be, the interest of the remaindermen in the corporate funds or property would remain the same as it did before the issuance of the new stock; but a different result follows upon

the distribution of the stock to the life tenant. It seems to me that the new stock issued by the board of the company, authorized and approved by the stockholders, clearly evidencing a conversion by the corporation of certain surplus earnings into capital, should, as between the remaindermen and the life tenant, be considered as capital, and not as income, in the same manner as the said surplus, undistributed and invested in improvements and betterments, inured to the benefit of the said trust estate before the stock was issued for the purpose of representing said surplus in capitalization.

I cannot accept the doctrine that the issuance of the new stock was in law a distribution of the surplus earnings of the railroad company, accruing before or after the death of the said testator and prior to the date of the authorization of the stock. For the issuance of the stock carries with it an interest not only in the earnings which had theretofore been expended and appropriated for substantial and permanent betterments and improvements to the company's railroads and appurtenances, under authority of the board of the company approved by its stockholders, which earnings by such use and by the issuance of the stock as representative of the increased value of the corporation, became and were capitalized; but the capitalization of such earnings and the issuance of stock therefor also carry therewith an interest in the pre-existing capital of the company, including the then outstanding stock representative of such capital. No intent of such character, on the part of the testator, affecting the remaindermen so vitally, is manifested by the testator's will, and in the absence of such intent, every presumption in law is against it. The distribution of the stock in question to the life tenant, affecting the tenants in remainder so prejudicially, without any clear intent of such distribution, on the part of the testator, is, it seems to me, inequitable. I am of the opinion that the new shares of stock in question, and now in the hands of the trustees, should be held by them as a part of the capital of the trust estate, to be by them disposed of under the terms of the will of the said testator, in accordance with the decree of the Chancellor.

It seems to me, after a careful consideration of the cases

dealing with the question, that this conclusion leads to results, as between the parties to this suit, more nearly just and equitable than does any other rule.

I am, therefore, for the affirmance of the decree of the Chancellor.